### CEGLOWSKI v. ZACHOR et al.

#### Civ. No. 2062.

United States District Court
D. North Dakota, Southeastern Division.

Nov. 15, 1951.

Clint Braden, of Wilburton, Okl., and Nels G. Johnson (of Johnson & Rausch), Bismarck, N. D., for plaintiff.

Joseph J. Funke, of Minot, for defendant W. A. Zachor as administrator.

B. H. Bradford, of Minot, N. D., for defendants Zachor et al.

VOGEL, District Judge.

Plaintiff, a resident of Oklahoma, brings this action against residents of North Da-

kota, asking for specific performance of an alleged contract to adopt. The amount involved exceeds the statutory requirement. This Court has jurisdiction.

Henry, also known as Harry, Ceglowski was born in Germany on December 2, 1900. His father was Andrew Ceglowski. His mother died a few months after his birth. Stephen Ceglowski was Andrew Ceglowski's brother. He and his wife, Theressa, lived at Portal, North Dakota. They had no children of their own. In 1912 or 1913, Stephen and Theressa Ceglowski left Portal, North Dakota, for Germany. Stephen stated "that he expected his boy and he was going to send him to school; that was Henry." (Tr. 94) In Germany, they talked with Andrew Ceglowski, the plaintiff's father, and entered into an agreement with him whereby they woud take the plaintiff with them to America. Details of the transaction occurring approximately forty years ago are necessarily vague and possibly difficult of ascertainment, but in the light of subsequent events and transactions it must be concluded that Andrew Ceglowski, the father of the plaintiff, agreed to give up all right to his son and that Stephen and Theressa Ceglowski agreed to take him to their home in America, adopt him and bring him up as their own as though he were their own child. To this arrangement the plaintiff gave consent.

Stephen and Theressa did take the plaintiff into their home at Portal and raised him as their own boy. For a number of years they sent him to school. On the school records, Stephen and Theressa were given as the parents of the plaintiff. Plaintiff continued in school until he was approximately 17 years of age. Shortly before he became 17 years of age, a life insurance policy in the amount of $2,000.00 was taken out on the plaintiff's life in which the beneficiaries were designated as "Stephan and Therese Ceglowski, parents of the insured, by adoption, share and share alike". (P.Ex. 1) Stephen and Theressa Ceglowski continuously referred to the plaintiff as "our boy", "my son Harry", or similar expressions. During the time the plaintiff lived with Stephen and Theressa, he did work around their business establishment and their

home. He received no wages. His treatment was identical with that which would have been accorded a natural son under similar circumstances. When the plaintiff became old enough to work out, he received the permission of Stephen and Theressa so to do. At one time, he worked for the Soo Line Railroad and was of such an age that parental permission was required. This was granted by Stephen and Theressa.

In 1922, when the plaintiff became married, he was still living in the household of Stephen and Theressa. He and his wife continued to live with Stephen and Theressa for a number of months after marriage. Subsequently, the plaintiff and his wife rented a dining room just across the border from Portal in Canada which they operated for a period of approximately two months. They then moved back into the home of Stephen and Theressa. Subsequently, they moved to Noonan, North Dakota where Stephen Ceglowski helped set them up in business. Later they moved to Columbus and then to Mohall, North Dakota. The testimony indicates that Stephen and Theressa Ceglowski assisted them continuously in the same manner that natural parents might assist a son and his wife in getting started in life. The plaintiff's wife was introduced by Stephen and Theressa as "our boy's wife" and she was treated by them as a daughter-in-law.

In 1931, the plaintiff and his wife moved to Oklahoma, the move being necessitated by reason of the plaintiff's health. During subsequent years, the plaintiff and his wife visited Stephen and Theressa and a correspondence was carried on between them not unlike the type of correspondence that would be expected between a son, his wife and the former's parents. While in Oklahoma, the plaintiff received some financial assistance from Stephen and Theressa Ceglowski. There were no arrangements for repayment.

When Stephen Ceglowski died in 1949, Theressa Ceglowski sent his personal possessions, including clothes, a musical instrument, Polish money, shaving kit and other keepsakes, to the plaintiff at the latter's home in Oklahoma. The plaintiff did not attend the funeral of Stephen Ceglow-

ski, claiming that the telegram announcing his death did not arrive in time for him to get there. His reply telegram of November 18, 1949, is Plaintiff's Exhibit 6 herein. In July, 1949, when Stephen was ill, he wrote to the plaintiff and his wife, asking them to visit him. The plaintiff's wife did visit Stephen and Theressa then for a period of about five weeks. During that time, Stephen suggested that the plaintiff and his wife sell out in Oklahoma and move back to Portal to live with him and Theressa. He wanted to buy them a place and set them up in business because he and Theressa were not well. He stated that the property, after his and Theressa's deaths, would be Henry's and hers anyway, whether they came and stayed or not.

On February 22, 1950, Theressa Ceglowski died intestate. The present action is brought by the plaintiff against the administrator of her estate and those who claim to be heirs thereof. The plaintiff did attend the funeral of Theressa Ceglowski and subsequently thereto he applied for letters of administration of her estate as the adopted son, he believing himself so to be. This proceeding was subsequently dropped when an examination of the records disclosed that Stephen and Theressa Ceglowski had not legally adopted the plaintiff. Stephen and Theressa had no children of their own. As an indication of the fact that they considered the plaintiff their son, there is introduced Plaintiff's Exhibit 7 which is an Affidavit of Support signed by Stephen Ceglowski on November 1, 1920, in which he states, "The present family dependent upon this deponent consists of wife and one son (the latter is self supporting)." In further support of the contention that Stephen and Theressa considered the plaintiff their son, there is introduced Plaintiff's Exhibit 3, which is also an Affidavit of Support signed by Stephen Ceglowski on December 18, 1920, in which he states, "The present family dependent upon this deponent consists of a wife and a son 20 years old who is self supporting." That he was referring to Henry there can be no doubt. Henry was then 20 years of age and was the only one living with Stephen and Theressa at that time and the only one who had lived with them.

Numerous letters written by the plaintiff and his wife to Stephen and Theressa and to Theressa have been introduced into evidence. In most of them, Stephen and Theressa are referred to as aunt and uncle, in one instance as "Dear Aunt and Mother to Me".

All of the substantial evidence in the record points to the conclusion that when Stephen and Theressa, a childless couple, returned to their former home in Germany they intended to adopt one of Stephen's brother's children as their own and to bring him back to America with them. They had no other children during their entire lifetime. They entered into an agreement with Andrew, the plaintiff's father, whereby Andrew was to give up all right to the plaintiff and they were to take him into their home as their own and adopt him. During their entire lifetimes they treated the plaintiff as natural parents might treat their own son, giving him assistance in financial difficulty, having their home open to him and to his wife all of the time, and lavishing upon him the same affection that they would have had he been their own child. They exhibited pictures of him to friends as "our boy". In return, the plaintiff treated Stephen and Theressa as his own parents, even living with them in their home after he was married. The Court must find under this evidence that there was an oral contract to adopt, that it was partially executed but that Stephen and Theressa did not go through the legal formalities of adoption.

In the defendants' answer, in paragraph 2 thereof, the defendants allege: "That if a contract was made as alleged in the petition of the plaintiff, that such contract violated the terms of the Statute of Frauds in that its performance was not to be performed within a year of the making thereof and that such alleged contract was not in writing and there is no memorandum or note thereof in writing and subscribed by the party alleged to be charged."

We have here an oral contract to adopt, not necessarily to be performed and cer-

516

tainly not performed within a year from the time the oral contract was entered into. The contract, however, was completely performed by the father of the plaintiff in relinquishing all right to his son and by the plaintiff himself in leaving Germany and going to Portal, North Dakota, with his aunt and uncle and living with them in the capacity of a son for many years thereafter. In other words, the contract insofar as the plaintiff and his father were concerned was fully performed. It was an executory contract only in that Stephen and Theressa did not go through the legal formalities of adoption. Equity will remove from the operation of the statute of frauds a contract such as here which has been executed on one side but only partially performed on the other. The statute is therefore inapplicable. For an excellent discussion of the statute of frauds as it is applicable or inapplicable to oral contracts for adoption see Gravelin v. Porier, 1926, 77 Mont. 260, 250 P. 823. This Court must hold that the statute of frauds is not a defense herein.

In defendants' brief, counsel refers to Section 111 of the Constitution of the State of North Dakota providing for original and exclusive jurisdiction in the County Court of probate and testamentary matters. As the Court understands counsel's contention, it is that the Probate Court has exclusive jurisdiction of this controversy. That question has already been passed upon by the Supreme Court of North Dakota in the case of Muhlhauser v. Becker, 1945, 74 N. D. 103, 20 N.W.2d 353, 354. The Court states the question in that case as follows: "Does the county court in the settlement of an estate have jurisdiction to determine the execution, validity and extent of a contract alleged to have been made by the decedent for the benefit of third persons, whom, it is claimed, he agreed to adopt and make his heirs?"

The question was answered by the Supreme Court of North Dakota in the negative, the Court stating, 20 N.W.2d at page 359:

"The county court has no jurisdiction to determine the validity of or rights under a contract made for the benefit of a third per-

son. The county court has the right to say who are named in the will as heirs or legatees and what share the will provides. If a third party claims an assignment of said legacy or an assignment of an interest in the real estate, that matter is determined by another court. The county court has the right to say what share the widow or the children will get in the estate of an intestate under the laws of succession; but where one asserts a claim against the estate and it is disallowed by the county court, the rights thereunder are determined by another court.

"The jurisdiction to determine whether a contract to adopt children was made, the extent and terms of such contract and whether it was executed by the one agreeing to adopt, is in a court of equity."

Page 361, of 20 N.W.2d: "As the County Court had no jurisdiction to determine the question involved, the appeal from the order of the county court did not confer jurisdiction on the distict court (Arnegaard v. Arnegaard et al., 7 N.D. 475, 75 N.W. 797, 41 L.R.A. 258), and there was no independent submission of the controversy to the district court."

In the foregoing opinion, the Supreme Court of North Dakota quotes with approval Gravelin v. Porier, supra, and states as follows, 20 N.W.2d at page 359: "At the time respondent sought to enforce this contract to adopt it would be practically impossible to resort to an action in law. Pecuniary compensation would be inadequate or almost impossible. If there was an agreement to adopt this agreement was breached years before the death of Gappert. The respondents could not be returned to the situation in which they were at the time the agreement was made. Under such conditions the Supreme Court of Montana, in Gravelin v. Porier et al., 77 Mont. 260, 250 P. 823, states that equity 'will specifically perform agreement to adopt involving personalty and real property, only where injured party cannot be returned to situation in which he was at time agreement was made, and pecuniary compensation would be inadequate or almost impossible of ascertainment, in view of Rev.Codes 1921,

§ 10613, subds. 4, 5.' The Montana Statute of Frauds."

Here the plaintiff and his natural father could not be returned to their prior situation and pecuniary compensation would be impossible of determination. The plaintiff must, as he has, resort to equity for relief.

Most courts recognize the power of a court of equity to enforce specific performance of an oral contract to adopt, but in doing so the rule is that the burden of establishing the oral contract must be by evidence that is clear, cogent and convincing and which must leave no reasonable doubt as to the agreement and the intention of the parties.

Much is made in the instant case of the fact that Stephen and Theressa were instrumental in bringing other relatives from Germany or Poland to the United States. Stephen and Theressa had prospered to some fair extent and were desirous of assisting others to come to America. Evidence of their having lent money or advanced the passage and expense money to others is contained in the record. In no instance, however, were any of these persons taken into the home of Stephen and Theressa and treated as their own or natural child. In each case, there was an agreement on the part of the person transported to repay to Stephen and Theressa the cost of the transportation and in each instance, so far as the record discloses, payment was made. A debtor-creditor relationship was created between Stephen and Theressa and the parties transported. It was recognized as such. In the case of the plaintiff, no such conditions existed. All evidence of the relationship between Stephen and Theressa and Henry points to the fact that they made an agreement to adopt, that they intended adopting him and treating him as their natural child.

Everything Stephen and Theressa did and said with reference to Henry and to his wife is consistent with plaintiff's theory. The entire relationship is inconsistent with a contrary conclusion. We have, first, the promise or agreement to adopt, Henry's natural father giving up all right to his son, Henry and his natural father agreeing to the new relationship, the taking of Henry into Stephen's and Theressa's home, treating him as a son, sending him to school, signing his report cards, signing parental permission to work when that permission was necessary, allowing Henry and his wife to live with them after marriage, referring to Henry as their "son" in affidavits of support, the taking out of insurance on Henry's life with the beneficiaries listed as "Stephan and Therese Ceglowski, parents of the insured, by adoption, share and share alike". Sixteen-year-old school boys, not yet earning their own living, do not take out life insurance in such manner without suggestion or help from parents. A recitation of more of the details brought out in the record is unnecessary.

This Court will accordingly grant plaintiff's prayer for specific performance of the oral contract of adoption. Plaintiff's counsel are directed to prepare and submit proposed Findings, Conclusions and Order for Judgment in harmony herewith and to serve copy thereof on opposing counsel, who may have ten (10) days thereafter within which to file objections.

It will be so ordered.