2000 ND 170

**Antonyio JOHNSON, Plaintiff and Appellee,**

v.

**Madonna L. JOHNSON, Defendant and Appellant.**

No. 990353.

Supreme Court of North Dakota.

Sept. 14, 2000.

Henry H. Howe, Howe & Seaworth, Grand Forks, N.D., for defendant and appellant.

Steven J. Simonson, Omdahl Law Office, Grand Forks, N.D., for plaintiff and appellee.

MARING, Justice.

[¶ 1] Madonna Johnson appeals a divorce judgment, challenging the trial court's denial of child support and spousal support and its division of the parties' property. She also argues the trial court erred in modifying an interim order without notice during appearances of counsel.

We do not address the latter issue because Madonna failed to raise it at trial. *In the Interest of B.D.*, 510 N.W.2d 629, 632 (N.D.1994). As to the other issues, we affirm in part, reverse in part, and remand for further proceedings consistent with this opinion.

## I.

[¶ 2] Madonna and Antonyio Johnson married in 1986, while both were serving in the United States Air Force and stationed in England. After their marriage, the Johnsons received a transfer to McGuire Air Force Base in New Jersey and were living there in 1988 when they received a phone call from Michelle Clayton, the wife of Madonna's son David Clayton. Michelle told them David was in jail in Vermont and she was stranded in Pennsylvania with two small children, the youngest of whom, Jessica, was David's child. Michelle was unable to find a place to stay and had no money, so Madonna and Antonyio drove to Pennsylvania to get Michelle and the children. Michelle stayed with the Johnsons for approximately one week, and then the Johnsons purchased a bus ticket for Michelle so that she could return to her family in Kentucky. Before she left, Michelle asked the Johnsons to take the three-month-old Jessica until she got back on her feet, and the Johnsons agreed. Madonna obtained a temporary order of custody, and the Johnsons planned to keep Jessica for 30 days; however, Michelle never returned to claim the child.

[¶ 3] In the ten years that followed, the Johnsons raised Jessica to believe she was their child; she called them her mother and father and they called her their daughter. Antonyio listed Jessica as his dependent on his federal tax returns. The Air Force listed Jessica as Antonyio's dependent daughter on his transfer orders and for medical benefits, placing her under his social security number. Though Jessica's birth certificate identified her last name as Clayton, the Johnsons consistently called

her Jessica Johnson. Jessica was baptized in Antonyio's family's church in Georgia, where both Antonyio and Madonna pledged to love and nurture Jessica, and to continue to take care of her. The Johnsons initiated adoption proceedings in both New Jersey and Kentucky, obtaining consents from her natural parents, but each time they were transferred before completion of the adoption.

[¶ 4] During these years, Jessica had only minimal contact with her biological parents and Madonna and Antonyio led Jessica to believe that David was her older brother. At some point, either David or Michelle told Jessica her true parentage. Madonna and Antonyio were upset by this because they felt Jessica was too young to be told. After Jessica learned her true parentage, the Johnsons told Jessica they had adopted her. Neither David nor Michelle ever expressed any interest in taking Jessica back.

[¶ 5] Madonna retired from the military in 1992, after 20 years of service, and began drawing a military pension, part of which is attributable to a disability benefit. At that time, Antonyio was transferred to the Azores, and Madonna and Jessica stayed in Kentucky because they could not accompany him. While Antonyio served abroad, he and Jessica exchanged videos, pictures, letters and cards and Antonyio continued to act as her father, signing his letters to her "Love, Dad." Following Antonyio's return from the Azores in 1993, he was assigned to Eglin Air Force Base in Florida and, at his request, Madonna and Jessica moved there to join him. While in Florida, Madonna took care of Jessica and also attended a local technical college in order to get a degree in education.

[¶ 6] During their tenure in Florida, Antonyio grew dissatisfied with the marriage. He received transfer orders to go to Korea without the family, and he informed Madonna he wanted her to file for a divorce before he got back. If she did not do so, he said he would initiate divorce proceedings upon his return. Madonna failed to

file for divorce, and upon Antonyio's return and subsequent assignment to Grand Forks Air Force Base, he initiated proceedings here in North Dakota.

[¶ 7] During the divorce trial, Madonna claimed she and Antonyio equitably adopted Jessica and sought child support from Antonyio. She also sought spousal support and a division of the parties' military pensions. The trial court issued a memorandum opinion, which it incorporated fully into the divorce judgment. In that memorandum opinion, it concluded North Dakota does not recognize the doctrine of equitable adoption, such that the concept was a "stranger to North Dakota jurisprudence." Therefore, the trial court refused to impose a child support obligation upon Antonyio. It also denied Madonna's request for spousal support, reasoning that both parties were "able bodied." Finally, the trial court divided the parties' property based on its weight in pounds and refused to divide the parties' military pensions.

## II.

[¶ 8] Madonna argues the trial court erred in its conclusion North Dakota does not recognize equitable adoption. We agree.

### A.

[¶ 9] North Dakota law clearly recognizes the doctrine of equitable adoption. Adoption, unknown to the common law, is entirely a creature of statute. *Matter of Adoption of K.A.S.*, 499 N.W.2d 558, 566 (N.D.1993). Before North Dakota's admission to the United States, our territorial laws regulated adoption. *See* 1887 Compiled Laws of the Territory of Dakota §§ 2622—2631. Following statehood, our early statutes also contained adoption provisions. *See* N.D. Rev.Code §§ 2797—2806 (1895). Our current adoption law, the Revised Uniform Adoption Act, is found in N.D.C.C. Ch. 14-15. The doctrine of equitable adoption developed in this state

alongside these laws and is grounded in the equitable principle that equity regards as done that which ought to have been done. *See* 7 Samuel Williston, *Law of Contracts* § 16.21, p. 471 (4th ed.1997); *see also* N.D.C.C. § 31–11–05(20) ("[t]hat which ought to have been done is to be regarded as done in favor of one to whom and against one from whom performance is due."). The doctrine holds that:

> when an individual who is legally competent to adopt a child enters into a valid and binding contract to do so, and when there is consideration supporting this contract in the form of part performance falling short of undertaking or completing a statutory adoption, the contract may be enforced in equity to the extent of allowing the child to occupy the status of a formally adopted child for certain purposes.

George A. Locke, Annotation, *Modern Status of Law as to Equitable Adoption or Adoption by Estoppel*, 97 A.L.R.3d 347, § 2[a] at 353 (1980). The doctrine is an equitable remedy to enforce a contract right and, therefore, it is not intended to create the legal relationship of parent and child, with all its attendant consequences, and does not effect a legal adoption. 2 Am.Jur.2d, *Adoption* § 53 at 930 (1994). The doctrine of equitable adoption, despite its name, bears almost no relationship to a statutory legal adoption. While the name may cause some confusion, we find its use prevalent in treatises and case law. Presented with this well established name, we conclude it best to use "equitable adoption" to describe this equitable remedy.

[¶ 10] Our own law of equitable adoption finds its roots within the context of a large-scale social experiment, the "placing out" of homeless and indigent children from urban areas in the East to the western United States. Between 1853 and 1929, 150,000 to 200,000 children were relocated by train to the west by charitable and religious societies.[1] *See* Marilyn Irvin

---

1. We note North Dakota's second governor, Andrew Burke, was an orphan placed out in

Holt, *The Orphan Trains: Placing Out in America* (University of Nebraska Press 1992). *See also* Donald Dale Jackson, *For city waifs, a bittersweet trip,* Smithsonian, vol. 17, no. 5, at 95 (1986); *Orphan Train Riders: Their Own Stories,* vols. 1–4 (Orphan Train Heritage Society of America, Inc.1992, 1993, 1995, 1997). Relocation of these children was seen as the answer to several social problems of the day. It alleviated growing population pressures due to immigration into eastern cities, while satisfying the call for labor in agricultural areas to the west. Holt, at 27. Further, child welfare reformers felt it afforded children of the street an opportunity to grow up with rural values in more "hopeful surroundings." *Id.* Most placements were memorialized only with an oral agreement made at the train platform and few children were ever formally adopted, leaving them in legal limbo. *Id.* at 141–42.

[¶ 11] Nearly all of our Court's cases dealing with equitable adoption arise from contracts to adopt entered into in that historical context. Our case law contains three reported cases dealing with the inheritance rights of children placed out in North Dakota by the New York Foundling Hospital, a Catholic organization which began moving children westward in 1870. Holt, at 109. In addition, the companion cases of *Borner v. Larson,* 70 N.D. 313, 293 N.W. 836 (1940), and *Muhlhauser v. Becker,* 74 N.D. 103, 20 N.W.2d 353 (1945), involve children who were received under a contract to adopt with a "children's home," though that organization and the children's origin are not identified.

[¶ 12] The first of these cases is *Klein v. Klein,* in which a young man placed in a North Dakota home sought to inherit from his deceased "mother," Katherine Klein. 69 N.D. 353, 286 N.W. 898 (1939). The young man, Nick, had never been formally adopted, but claimed he should inherit according to an indenture contract Katherine

entered into with the Foundling Hospital in 1922. *Id.* at 899–900. The contract provided Katherine could return him to the Foundling Hospital until he reached the age of twenty-one, canceling the indenture; however, if she elected to keep him, he was to be considered her own child and would inherit from her estate as would a natural child. *Id.* Nick was a "hard child to manage" and was "addicted to thievery," such that he was committed to the State Training School as a juvenile. *Id.* at 900. During Nick's period of legal troubles, Katherine's priest wrote to the Foundling Hospital to communicate Katherine's wish that it retrieve Nick. *Id.* The Foundling Hospital wrote back, expressing sorrow that Nick "turned out so unsatisfactorily," and indicated the next agent in North Dakota would take Nick back. *Id.* at 901. Our Court stated a contract promising to devise property could be enforced in equity. *Id.* at 902. However, the Court concluded the contract with the Foundling Hospital was terminated before Nick's twenty-first birthday, and thus he could not inherit from Katherine's estate, despite that the Foundling Hospital never sent someone for him. *Id.* at 901–02.

[¶ 13] The next two cases, *Borner* and *Muhlhauser,* involved siblings who sought to inherit from a deceased as his children, based on his unfulfilled promise to adopt them. In *Borner,* the siblings wished to be recognized as the deceased's adopted children so they could nominate an administrator for the estate under § 8657, 1913 Comp. Laws. 293 N.W. at 837. A three justice majority of this Court held the children were not entitled to nominate an administrator under that statute because they had not been adopted according to statutory procedures. *Id.* at 840. The majority stated, however, its decision in no way determined the children's interest in the estate; should they come forward with proof of a contract to adopt, their rights

---

Indiana in 1859. Holt, at 125–26. Burke governed in North Dakota from 1891–92, when he was defeated in his bid for a second

term. *See* North Dakota Centennial Blue Book 125 (1989). *See also* John Manesis, *The Journey of Andrew Burke* (1998).

would be determined according to that agreement. *Id.* Two dissenting justices argued the children clearly established the deceased entered into a contract to adopt them which created the same "rights, obligations and duties that an adoption legally executed would have created." *Id.* The minority thus contended the children were entitled to nominate an administrator under the statute. *Id.* In *Muhlhauser*, the same parties returned, though in that case the issue was the authority of the county court to interpret the contract to adopt. 20 N.W.2d at 354. The court recognized that a contract to adopt could be specifically enforced in equity, but concluded the county court, which was not a court of equity, had no jurisdiction to interpret such a contract. *Id.* at 359. *See also Zimmerman v. Kitzan*, 65 N.W.2d 462, 466 (N.D.1954) ("Such a contract may be established in a court of equity if there is sufficient evidence.").

[¶ 14] Our Court next considered equitable adoption in *Fish v. Berzel*, 101 N.W.2d 548 (N.D.1960). There, we concluded a child placed here under a Foundling Hospital indenture, which was never canceled, could inherit as would a natural child of the deceased, despite that she was never adopted according to statutory procedures. *Id.* at 556–57. Further, we honored the contract to adopt, under which the child received one-half of the estate, over the decedent's wishes expressed in his will, which left the child only one-third. *Id.* at 551.

[¶ 15] Finally, this Court considered the right of individuals to inherit from a child placed in the home of their natural parents under a contract with the Foundling Hospital. *Geiger v. Estate of Connelly*, 271 N.W.2d 570, 571 (N.D.1978). John Connelly was received under an indenture into the North Dakota home of John and Annie Geiger; he died without lineal descendants, and the Geigers' natural children and grandchildren claimed the indenture had the legal effect of a statutory adoption, which would allow them to inherit from his

estate. *Id.* at 572–73. Our Court disagreed. Relying on *Fish*, we stated the beneficiary of such an indenture could inherit according to the laws of intestate succession because of the indenture's terms, but that the contract's terms went no farther. *Id.* at 573. We concluded a contract or agreement to adopt "does not, in and of itself, create a status of parent and child between the child and the promisor." *Id.*

[¶ 16] In addition to the case law of this Court, we consider persuasive the case of *Ceglowski v. Zachor*, 102 F.Supp. 513 (D.N.D.1951). In that case, a childless North Dakota couple, Stephen and Theressa Ceglowski, traveled to Germany where they agreed to adopt the child of Stephen's brother, Andrew. *Id.* at 514. The Ceglowskis promised to adopt the child, named Henry, and to bring him up as if he was their own; however, the couple never formally adopted Henry. *Id.* at 515. Stephen died in 1949, and Theressa died intestate in 1950; Henry sought to inherit from the estate under the 40–year old contract. *Id.* at 514–15. The district court concluded North Dakota law allowed specific enforcement of a contract to adopt so long as the contract was established by "clear, cogent and convincing" evidence, which left no reasonable doubt as to the agreement and the parties' intentions. *Id.* at 517. Finding the contract to be clearly established by evidence of the parties' conduct, the court concluded the agreement should be specifically enforced. *Id.*

[¶ 17] We conclude longstanding North Dakota precedent recognizes the doctrine of equitable adoption, in that our Court has repeatedly held a contract to adopt may be specifically enforced in equity. Therefore, we hold the trial court erred in concluding the doctrine is unknown to our law.

### B.

[¶ 18] Madonna recognizes our prior case law deals with contracts to adopt only in the context of inheritance law. She

argues, however, that the doctrine should also apply in the domestic context of child support and child custody. We agree.

[¶ 19] We consider instructive several cases of other courts which have considered the issue now before us.[2] In *Wener v. Wener,* the court determined a divorcing husband was obligated to pay child support for a child because he agreed with his wife, who was not the child's natural mother, to adopt the child and held the child out as his own. 35 A.D.2d 50, 312 N.Y.S.2d 815, 817–18 (N.Y.App.Div.1970). In that case, the husband supported the child during the marriage, claimed the child as his dependent on a federal income tax return, wrote a letter to his wife expressing his love for the child, and sent the child a card which he signed "Love Dad"; however the child was never formally adopted and the parental rights of its natural parents were never terminated. *Id.* at 817. The court stated that, "[h]aving agreed to adopt the child and support her, and having treated her as his own prior to the parties' separation, the [husband] may not now disavow all obligation and shift the entire burden onto [his wife]." *Id.* at 818. *See also Lewis v. Lewis,* 85 Misc.2d 610, 381 N.Y.S.2d 631 (N.Y.Sup.Ct.1976).

[¶ 20] The Nevada Supreme Court has also imposed a child support obligation based on a contract to adopt made between spouses. In *Frye v. Frye,* a child's stepfather agreed with his wife to adopt her child from a previous marriage and treated the child as his own, such that the child perceived him as her own father. 103 Nev. 301, 738 P.2d 505, 505 (1987). The stepfather saw an attorney regarding the adoption, effectuated the termination of the parental rights of the child's natural father, and signed a petition to adopt indicating he wished to establish a parent-child relationship. *Id.* The adoption, however, was never finalized, and during di-

vorce proceedings the stepfather denied any obligation toward the child. *Id.* The court concluded the stepfather intended to, and promised he would, adopt the child, and in furtherance of that promise, left the child without a legal father. *Id.* at 506. The court concluded the doctrine of equitable adoption allowed a child support obligation to be imposed upon the stepfather, stating that "where there is a promise to adopt, and in reasonable, foreseeable reliance on that promise a child is placed in a position where harm will result if repudiation is permitted, the courts of this state stand ready to provide such remedies as equity requires." *Id.*

[¶ 21] Finally, in *Geramifar v. Geramifar,* the Maryland Court of Appeals recently concluded the doctrine of equitable adoption could be used to compel an adoptive parent to pay child support. 113 Md. App. 495, 688 A.2d 475 (1997). In that case, the parties traveled to Iran to adopt a child, promising each other and the Republic of Iran that they would care for the boy. *Id.* at 478. Four months after taking the child, the parties separated without ever having initiated adoption proceedings or the termination of the child's natural parents' rights. *Id.* at 476. The court concluded there was a contract between the husband and wife to adopt, care for and support the child and, thus, that the parties effected an equitable adoption. *Id.* at 478. Following this equitable adoption, the husband had a duty to support the child and the child's best interests required enforcement of that obligation. *Id.* at 479.

[¶ 22] The current case presents us with circumstances which are similar or identical to those present in the cases above, and we agree with the reasoning employed by those courts. We conclude our state's public policy supports application of the

2. A review of case law shows that courts in other states differ in their approach to this issue. *See Geramifar v. Geramifar,* 113 Md. App. 495, 688 A.2d 475 (Ct.App.1997), *Frye v. Frye,* 103 Nev. 301, 738 P.2d 505 (1987);

*Lewis v. Lewis,* 85 Misc.2d 610, 381 N.Y.S.2d 631 (N.Y.Sup.Ct.1976). *But see Dep't of Human Resources v. Tabb,* 221 Ga.App. 766, 472 S.E.2d 540 (Ct.App.1996).

doctrine of equitable adoption and that nothing in North Dakota law bars such an application.

[¶ 23] In circumstances involving child welfare in this state, the best interests of the child are paramount, their importance often surpassing the interests of adults involved. Our statutes mandate that we look to the child's best interests to determine an appropriate outcome in situations involving custody of a child when parents divorce, N.D.C.C. § 14–09–06.2; the appointment of a guardian ad litem for a child, N.D.C.C. § 14–09–06.4; imposition of supervised visitation between a child and an abusive parent, N.D.C.C. § 14–05–22; modification of a child custody arrangement following a divorce judgment, N.D.C.C. § 14–09–06.6; the custody of an illegitimate child, N.D.C.C. 14–09–05; placement of a juvenile offender outside her home and possibly out-of-state, N.D.C.C. § 27–20–02; placement in treatment services for children with serious emotional disorders, N.D.C.C. § 50–06–06.13; and the disposition of a deprived child, N.D.C.C. § 27–20–30. We also look to the child's best interests in determining whether and how much child support to award. N.D.C.C. § 14–09–09.7; *see also* N.D.A.C. Ch. 75–02–04.1.

[¶ 24] In addition, our case law shows a consistent recognition that the best interests of children take precedence in cases involving their well-being. Our Court has stated that while visitation is a privilege of a non-custodial parent, it is a right of the child, and that such visitation is presumed to be in the child's best interests. *Hendrickson v. Hendrickson*, 2000 ND 1, ¶ 21, 603 N.W.2d 896. We have also stated the "primary purpose of visitation is to promote the best interests of the children, not the wishes or desires of the parent." *Moilan v. Moilan*, 1999 ND 103, ¶ 29, 598 N.W.2d 81. We have held a child's best interests may require scheduled visitation

with someone who is not the child's parent. *Love v. DeWall*, 1999 ND 139, ¶ 8, 598 N.W.2d 106. We have developed factors to be considered when determining whether a change of residence of a custodial parent is in a child's best interests. *Stout v. Stout*, 1997 ND 61, ¶ 34, 560 N.W.2d 903. Finally, we have held that a psychological parent may be given custody of a child, and that the child's best interests must be considered in determining whether to place a child in the custody of such a non-parent third-party. *Hamers v. Guttormson*, 2000 ND 93, ¶ 5, 610 N.W.2d 758.

[¶ 25] We conclude the public policy of this state, expressed through both our statutes and this Court's case law, requires protection of the welfare and best interests of children. Applying the doctrine of equitable adoption to impose a child support obligation, when the circumstances of the case require it, fully comports with this public policy.

[¶ 26] In addition, we conclude nothing in the law of this state bars application of the doctrine in the context of a child support obligation. First, the existence of statutory adoption procedures does not forbid the proposed application of the doctrine. As we explained above, the doctrine of equitable adoption developed in this state alongside our long existing statutes authorizing formal adoption. Nothing in our current adoption law or in its legislative history suggests our legislature intended its enactment to do away with the well established equitable doctrine. *See* N.D.C.C. Ch. 14–15; *Minutes of the House Judiciary Committee on H.B. 1161* (Feb. 3, 1971); *Reports of Senate Committee on the Judiciary on H.B. 1161* (March 2, 1971). Rather, our adoption statutes and the doctrine of equitable adoption coexist, operating side by side to promote the best interests of the child.[3] As stated by the Texas Supreme Court in *Cubley v. Barbee*,

---

3. We recognize, overall, statutory adoption is clearly preferable to equitable adoption in that the formality of statutory procedures impress upon those seeking to adopt the gravity of the decision, the adoption procedures are designed to ensure that children are not

[e]quity follows the law except in those matters which entitle the party to equitable relief, although the strict rule of law be to the contrary. It is at this point that their paths diverge. As the archer bends his bow that he may send the arrow straight to the mark, so equity bends the letter of the law to accomplish the object of its enactment.... [H]e who has taken possession of a child in the capacity of an adopting parent cannot escape the duties and liabilities incident to that capacity by failing to follow the forms that the statute has prescribed to that end.

123 Tex. 411, 73 S.W.2d 72, 81 (1934) (citing *Holloway v. Jones,* 246 S.W. 587, 590 (Mo.1922)). Finally, this Court decided *Geiger* seven years after the 1971 enactment of our present adoption statutes. 271 N.W.2d 570. In that case, we did not hold the doctrine of equitable adoption had been preempted by the Revised Uniform Adoption Act, but instead we reaffirmed the viability of the doctrine. *Id.*

▬▬ [¶ 27] Second, we conclude the statutes comprising the Uniform Parentage Act ("UPA"), N.D.C.C. Ch. 14–17, do not apply to the circumstances presented in this case. In *P.E. v. W.C.,* we declared the UPA's purpose was to provide "substantive legal equality for all children, regardless of the marital status of their parents, and to identify the person against whom the children's rights may be asserted." 552 N.W.2d 375, 377 (N.D.1996). In doing so, we relied on the comments of the drafters of the uniform law. *See* 9B *Uniform Laws Annotated,* UPA Prefatory Note (1987). An examination of those comments reveals the UPA's drafters were primarily concerned with the legal system's disparate treatment of legitimate and illegitimate children. *Id.* at 287–89. Our own legislative history regarding its enactment in this state indicates propo-

nents of the act contemplated it as a means of identifying a child's natural father. *See Minutes of the Senate Committee on the Judiciary on S.B. 2245* (Jan. 27, 1975). To that end, the UPA contains provisions establishing a presumption of paternity, N.D.C.C. § 14–17–04; declaring who may bring an action to determine paternity, N.D.C.C. § 14–17–05; imposing a time limit for bringing such an action, N.D.C.C. § 14–17–06; declaring circumstances under which jurisdiction exists in the courts of this state to hear such an action, N.D.C.C. § 14–17–07; establishing requirements for tests used to determine whether a genetic relationship exists, N.D.C.C. § 14–17–10; and identifying types of evidence which may be produced to establish or rule out paternity, N.D.C.C. § 14–17–11. Thus, the history and provisions of the UPA clearly indicate it applies within the context of determining the paternity of an illegitimate child. The case currently before this Court does not arise in that context because Jessica's parentage is known; she is the natural child of David and Michelle Clayton. Rather, this case concerns events outside the context of a paternity determination, which the provisions of the UPA do not address.

[¶ 28] We acknowledge the UPA contains sections which, at first glance and read alone, would appear to relate to the case at bar. Section 14–17–01, N.D.C.C., defines a "parent and child relationship" as one between a child and her natural or adoptive parents "incident to which the law confers or imposes rights, privileges, duties, and obligations." Section 14–17–03, N.D.C.C., states such a relationship may be established between a child and an adoptive parent "by proof of adoption under the Revised Uniform Adoption Act." We determine these provisions do not apply to the circumstances of this case.

adopted by unsuitable persons, and the formal procedures establish and clarify the rights and obligations of both the adoptive and natural parents. *Otero v. City of Albuquerque,* 125 N.M. 770, 965 P.2d 354, 360–61

(Ct.App.1998). This preference for adherence to statutory procedures requires that the doctrine of equitable adoption be applied only in limited circumstances, as discussed below.

[¶ 29] There is no evidence in the comments of the UPA's drafters or in our legislative history indicating these provisions were intended to apply to the circumstances contemplated by the doctrine of equitable adoption. Further, the comments of the UPA's drafters state the act was intended to be "one interlocking and interdependent piece of legislation," which would "not lend itself to being enacted in part." 9B *Uniform Laws Annotated*, UPA Prefatory Note at 289. Thus, each part of the UPA should be read in context with the others, in order to effectuate its purpose. As we explained above, the purpose of the UPA, determining who is to be considered a child's natural parents, is not implicated in this case because Jessica's natural parentage is not disputed. The UPA's policies and purpose simply do not apply in this kind of case; thus, those provisions do not dispose of our doctrine of equitable adoption. Finally, our decision in *Geiger* is relevant to our determination the UPA does not apply here. We decided *Geiger* in 1978, three years after our legislature enacted the UPA. 271 N.W.2d 570. We did not conclude the, then recently enacted, UPA did away with our long-standing doctrine of equitable adoption. Further, while we stated a contract to adopt did not, "in and of itself" establish a parent-child relationship, we did not hold such a relationship could only be established by compliance with the terms of the UPA. *Id.* at 573. Thus, we conclude the UPA does not bar us from applying the doctrine of equitable adoption in the context of a child support obligation.

[¶ 30] Third, we conclude the circumstances in the case presently before us are not those contemplated by N.D.C.C. § 14–09–09, which governs the liability of a stepparent for support of a stepchild, and therefore, that the statute does not preclude the imposition of a child support obligation in this case. Under that section, a stepparent is not liable for the support of her spouse's dependent child "unless the child is received into the stepparent's family." If a stepparent receives a child into the family, "the stepparent is liable, to the extent of the stepparent's ability, to support [the child] during the marriage and so long thereafter as [the child] remain[s] in the stepparent's family."

[¶ 31] We have stated that a "stepparent naturally takes on a family relationship with children of a spouse." *Hedstrom v. Berg*, 421 N.W.2d 488, 489 (N.D.1988). We believe a relationship of love, affection, kindness and generosity between stepparent and stepchild is in a stepchild's best interests. It would be contrary to our state's public policy to undermine the development of such relationships by encumbering a normal stepparent-stepchild relationship with the threat of child support obligations which go beyond that required by N.D.C.C. § 14–09–09. Stepparents in this state might refrain from taking their spouses' children into their homes, for fear that their kindness could result in the accrual of a burdensome obligation. We recognize, given the increased prevalence of blended families in our society, such a result would be detrimental to many children in this state.

[¶ 32] Yet the relationship presented in this case is not the normal stepparent-stepchild relationship envisioned by that statute. In such a normal relationship, the child is aware that the stepparent is just that, the spouse of the child's natural parent. Though the stepparent may, and hopefully does, extend love to the child through words and deeds, the stepparental context of those actions is understood by all involved. In the case at bar, Antonyio and Madonna led Jessica to believe she was their natural child; both parents and child referred to Antonyio as Jessica's father or dad. Antonyio also participated in leading Jessica to believe that her natural father was, in fact, her brother. Finally, even after Jessica learned her true parentage, the Johnsons told Jessica they had formally adopted her. Thus, the parties engaged in an elaborate fiction, which is

not a part of the normal stepparent-step-child relationship and which is not contemplated by N.D.C.C. § 14–09–09. The normal stepparent-stepchild relationship also does not involve a contract to adopt the stepchild, which is required for application of the doctrine of equitable adoption. Thus, the existence of a contract to adopt and the parties' construction of fictional relationships removes this case from the arena of normal stepparent-stepchild obligations regulated by N.D.C.C. § 14–09–09. Nothing in this opinion should be construed as imposing new obligations on a normal stepparent-stepchild relationship.

[¶ 33] Finally, we conclude our child support guidelines do not preclude the imposition of a child support obligation on one who has equitably adopted a child. Section 75–02–04.1–01(1), N.D.A.C., defines a child as "any child, by birth or adoption, to whom a parent owes a duty of support." The regulation does not state that such an obligation may be imposed only in cases where a child has been adopted according to statutory procedures. In addition, we believe our state's public policy of promoting the well-being of children, which is expressed through the guidelines, supports the imposition of a child support obligation on an equitable parent when the circumstances of the case require it. Finally, Antonyio conceded at oral argument if our state recognized the doctrine of equitable adoption, nothing in the child support guidelines would bar the imposition of such an obligation on an equitable parent.

[¶ 34] Based on the foregoing analysis, we conclude the doctrine of equitable adoption may be applied to impose a child support obligation upon an equitable parent when the circumstances of the case so require. North Dakota's well established policy of protecting the best interests and welfare of children supports such an application and nothing in our state's present law forbids it, should facts and circumstances supporting it be proven.

C.

[¶ 35] Madonna argues she presented evidence to the trial court which proved she and Antonyio equitably adopted Jessica and which justifies the imposition of a child support obligation upon Antonyio.

[¶ 36] The evidence establishing the contract to adopt must be clear, cogent and convincing evidence. *See Ceglowski,* 102 F.Supp. at 517. We have stated that in order to create an enforceable contract, there must exist a mutual intent to create a legal obligation. *Moen v. Meidinger,* 1998 ND 161, ¶ 6, 583 N.W.2d 634. However, "[i]t is the words of the contract and the manifestations of assent which govern, not the secret intentions of the parties." *Id.* (citing *Amann v. Frederick,* 257 N.W.2d 436, 439 (N.D.1977)). Thus, the parties' mutual assent to a contract is to be determined by their "objective manifestations of contractual assent." *Id.*

[¶ 37] The contract to adopt must be supported by consideration. The existence of consideration is a question of law. *Matter of Estate of Jorstad,* 447 N.W.2d 283, 285 (N.D.1989). Good consideration may consist of a benefit to the promisor or a detriment to the promisee. N.D.C.C. § 9–05–01; *Maragos v. Norwest Bank Minnesota, N.A.,* 507 N.W.2d 562, 565 (N.D.1993). Antonyio testified he agreed to adopt Jessica in order to preserve marital harmony. This form of non-economic consideration is similar to that which has been held valid in equitable adoption cases in the inheritance context. *See* Locke, Annotation, *Modern Status of Law as to Equitable Adoption or Adoption by Estoppel,* 97 A.L.R.3d 347, § 2[a] at 355 (e.g. love and affection accruing to the adoptive parent from the child, giving by the child of companionship and obedience).

[¶ 38] We adhere to our statement in *Geiger,* however, that a contract to adopt "does not, in and of itself, create the status of parent and child between the child and the promisor." 271 N.W.2d at

573. Application of the doctrine of equitable adoption in the domestic context, unlike its application in inheritance cases, contemplates an ongoing relationship between living parties and, therefore, something more than the agreement to adopt is required.

■■■■ [¶ 39] The inquiry includes whether there exist indicia of a true parent-child relationship between the child and the alleged equitable parent. *See* 2 Am.Jur.2d, *Adoption* § 55 at 933–34 (1994). Some of the facts and circumstances considered by courts include representations by the alleged equitable parents to the child that she was their natural child; representations to the child that she had been adopted; holding the child out to the community as their child; baptizing the child as their daughter in the family's church; claiming the child as a dependent on income tax returns; having the child use the alleged equitable parent's last name; referring to the alleged equitable parents as mom and dad; signing cards and letters to the child "Love, Dad"; incomplete efforts to adopt the child and the natural parents' consent to the adoption of the child. *See* Locke, *Law as to Equitable Adoption,* at 358; 2 Am.Jur.2d, *Adoption* § 55 at 934 (1994). An additional factor tending to establish that a child was equitably adopted is the distant relationship with the natural parents.[4] *See In re Marriage of Valle,* 53 Cal.App.3d 837, 126 Cal. Rptr. 38 (Cal.Ct.App.1975); *see also* 2 Am. Jur.2d, *Adoption* § 55 at 934 (1994).

■■■■ [¶ 40] Antonyio argues even if the doctrine of equitable adoption may be applied to impose a child support obligation, Madonna does not have standing to seek that remedy because she is not Jessica's natural parent. We disagree. "Standing is a concept utilized to determine if a party is sufficiently affected so as to insure that a justiciable controversy is presented to the court." *Billey v. North*

*Dakota Stockmen's Association,* 1998 ND 120, ¶ 7, 579 N.W.2d 171. Madonna is a party to the contract to adopt and, in her counterclaim below, she requested that the trial court determine she and Antonyio equitably adopted Jessica, making her their child and imposing parental obligations upon both of them. The substantive circumstances of this case, a divorce in which child support was requested, are identical to the other cases in which husbands have been held to have equitably adopted children for the purposes of imposing child support. *See Wener,* 35 A.D.2d 50, 312 N.Y.S.2d 815; *Frye,* 103 Nev. 301, 738 P.2d 505; *Geramifar,* 113 Md.App. 495, 688 A.2d 475. Further, the circumstances presented by this case are similar to those in *Geramifar,* in that there, the parties never initiated adoption proceedings and neither party was a natural parent of the child. 688 A.2d at 476. We determine there is no requirement that a party to a contract to adopt, who brings a suit to enforce that contract, must be the child's natural parent, and also that child support is a natural and proper subject in a divorce action. We conclude Madonna's status as a party to the contract to adopt and as the individual now acting as the child's mother by equitable adoption makes her "sufficiently affected" so that she presents a justiciable controversy.

#### D.

■■■ [¶ 41] North Dakota's law has recognized the doctrine of equitable adoption for six decades and developed this equitable remedy to protect children. Our case law has consistently upheld this doctrine. The public policy of our state supports application of the doctrine to impose a child support obligation under certain circumstances and nothing in our law forbids it. However, whether the particular facts and circumstances of this case establish that Jessica was equitably adopted and

---

4. We conclude an equitable adoption may occur without termination of the natural parents' parental rights. It would be antithetical to impose such a requirement on a doctrine, the existence of which is based on the noncompliance with other procedures.

warrant application of the doctrine to impose a child support obligation upon Antonyio is a factual question which must be resolved by the trial court. 2 Am.Jur.2d, *Adoption* § 53 at 932 (1994). Thus, we reverse the trial court judgment concluding Antonyio is not Jessica's equitable parent. We remand for the trial court to make findings of fact and to apply the law set forth in this opinion.

### III.

[¶ 42] Madonna argues the trial court's refusal to divide the parties' military pensions, using the *Bullock* formula, was clearly erroneous. From the record before us, we are unable to determine the rationale underlying the trial court's decision. Therefore, we remand for the trial court to clarify its findings and reasoning.

 [¶ 43] Under N.D.C.C. § 14–05–24, a trial court must make such equitable distribution of the marital property of divorcing parties, "as may seem just and proper." The trial court's determinations regarding property division are treated as findings of fact which this Court will not reverse unless clearly erroneous. N.D.R.Civ.P. 52(a); *Mellum v. Mellum,* 2000 ND 47, ¶ 14, 607 N.W.2d 580. There is no set formula for this division, but rather it should be based on the facts of the case. *Mellum,* at ¶ 14.

 [¶ 44] In dividing property, the trial court is to use the *Ruff–Fischer* guidelines, considering the following factors:

the respective ages of the parties to the marriage; their earning abilities; the duration of the marriage and the conduct of each during the marriage; their station in life; the circumstances and necessities of each; their health and physical conditions; their financial circumstances as shown by the property owned at the time; its value and income-producing capacity, if any, and whether it was accumulated or acquired before or after the marriage; and such other matters as may be material.

*Kautzman v. Kautzman,* 1998 ND 192, ¶ 9, 585 N.W.2d 561. The distribution need not be equal to be equitable, but the trial court must explain a substantial disparity in the division. *Fox v. Fox,* 1999 ND 68, ¶ 7, 592 N.W.2d 541. We do not require the trial court to make specific findings; however it must indicate its rationale in distributing the property. *Weigel v. Weigel,* 2000 ND 16, ¶ 6, 604 N.W.2d 462. We will remand for clarification of missing or conclusory findings when we are unable to determine the trial court's rationale through inference and deduction. *Mellum,* at ¶ 16.

[¶ 45] We have held that federal military retirement pensions are divisible martial property assets. *Bullock v. Bullock,* 354 N.W.2d 904, 907–08 (N.D.1984). In *Bullock,* we approved a formula for distributing such pensions: the years of marriage divided by the number of years served in the military multiplied by one-half the retirement pay. *Id.* at 908–09, 911. However, this Court has also stated the *Bullock* formula is not the only method of evaluating and distributing retirement pay as part of the estate. *Anderson v. Anderson,* 504 N.W.2d 569, 571 n. 2 (N.D.1993).

 [¶ 46] In this case, the trial court refused to divide the parties' military pensions. Such a refusal is not, in and of itself, clearly erroneous. However, on the record before us, we are unable to determine the trial court's rationale for this decision because we lack information on the division of the couple's other marital assets. The trial court's memorandum opinion, which it incorporated into the divorce judgment, states that Madonna may retain "the approximately 11,000 pounds of personal property of the approximately 14,000 pounds of personal property and effects possessed by the parties at the time of their separation" and Antonyio may retain the remainder. The memorandum opinion and judgment do not explain what items are included in the 14,000 pounds of

property distributed between the parties, and never address the value of this property.

[¶ 47] Given the lack of information in the record regarding the parties' other property, we are unable to determine whether the trial court's refusal to divide the military pensions resulted in an equitable division of the parties' marital estate. Therefore, we remand for the trial court to clarify its findings and the reasoning underlying its decision, according to the *Ruff–Fischer* guidelines.

### IV.

[¶ 48] Madonna contends the trial court's refusal to award or reserve temporary or permanent spousal support was clearly erroneous. We disagree.

[¶ 49] Spousal support determinations are treated as findings of fact which will not be set aside on appeal unless clearly erroneous. *Weigel*, 2000 ND 16, ¶ 6, 604 N.W.2d 462. A finding of fact is clearly erroneous under N.D.R.Civ.P. 52(a) only if it is induced by an erroneous view of the law, there is no evidence to support it, or, though some evidence supports it, on the entire record we are left with a definite and firm conviction a mistake has been made. *Riehl v. Riehl*, 1999 ND 107, ¶ 7, 595 N.W.2d 10. In determining whether spousal support should be awarded, the trial court should apply the *Ruff–Fischer* guidelines; though a trial court need not make specific findings as to each factor, we must be able to discern a rationale for its determination. *Id.* at ¶ 8. In order to award spousal support, the trial court must find the requesting spouse is disadvantaged. *Id.* at ¶ 9. A "disadvantaged" spouse is one who has "foregone opportunities or lost advantages as a consequence of the marriage and who has contributed during the marriage to the supporting spouse's increased earning capacity." *Id.*

[¶ 50] From the record before us, we are unable to determine the trial court's decision to deny spousal support was clearly erroneous. Madonna served in the military for twenty years and now earns a military pension, along with which she receives some benefits. She was employed during much of the parties' marriage and is currently working as an administrative assistant at a technical college. While living in Florida, Madonna did not work, but instead pursued and nearly completed a degree in elementary education. She estimates she has approximately one and one-half more years of classes to take in order to finish her degree, and she testified she receives free tuition for school through her employer. The trial court considered her "able bodied."

[¶ 51] There is evidence in the record suggesting Madonna is not a disadvantaged spouse and supporting the trial court's decision to deny spousal support. Thus, that decision is not clearly erroneous, and we affirm. On remand, however, following clarification of the parties' property division, the trial court may revisit its decision to deny spousal support because the two issues are so closely intertwined. *See Emter v. Emter*, 1999 ND 102, ¶ 14, 595 N.W.2d 16.

### V.

[¶ 52] We conclude our case law has long recognized the doctrine of equitable adoption and that the doctrine may be applied, when the circumstances of the case require, to impose a child support obligation on an equitable parent and to justify an award of visitation to such a parent.[5] Therefore, we reverse the decision of the trial court concluding Antonyio and Madonna did not equitably adopt Jessica, and we remand for the trial court to determine whether the facts of this case warrant

5. We have often stated visitation is a privilege of a non-custodial parent and a right of the child; such visitation is presumed to be in a

child's best interests. *Hendrickson*, 2000 ND 1, ¶ 21, 603 N.W.2d 896.

application of the doctrine of equitable adoption. On remand, the trial court is also to clarify its division of the parties' marital property, according to the *Ruff–Fischer* guidelines, and explain its rationale for refusing to divide the parties' military pensions. Finally, we affirm the trial court's denial of Madonna's request for spousal support, but we determine the trial court may revisit the issue on remand in conjunction with its review of the division of the parties' property.

[¶ 53] GERALD W. VANDE WALLE, C.J., WILLIAM A. NEUMANN, CAROL RONNING KAPSNER, JJ., concur.

SANDSTROM, Justice, dissenting.

[¶ 54] This is a case of a grandmother and her grandchild who have never lived in North Dakota. When the child's parents could not or would not care for her, her grandmother took her in. The grandmother's husband, although not the child's grandfather, welcomed the child and treated her well. The grandmother, but not her husband, was given temporary legal custody of the child. There was talk of adoption and some steps were taken, but the grandmother's husband did not adopt the child, nor did the grandmother adopt the child. The parental rights of the child's natural mother and natural father were never terminated. When the marriage of the grandmother and her husband was coming to an end, the grandmother, instead of seeking support from the child's parents, sought a declaration that her husband had "equitably adopted" the child and was therefore obligated to pay child support. The trial court held that North Dakota does not recognize such "equitable adoption," and even if it did, this is not a case in which the facts would justify it.

[¶ 55] This is also a case of a majority so intent on reaching a particular result that it wreaks havoc with our law, distorting and ignoring previous holdings, and invading the province of the legislature and of the trial court. The majority abandons judicial objectivity, reciting "facts and circumstances" only from the grandmother's perspective, giving it her "spin" and omitting "inconvenient" evidence.

[¶ 56] The majority conjures an opinion with blue smoke and mirrors. The majority employs a now-you-see-it, now-you-don't shell game with the law and the facts. Is "equitable adoption" adoption, or is it not? The majority, here and there, says "it is" and "it is not." But the problem for the majority is that if "equitable adoption" is adoption, it has not occurred. If it is not adoption, then the majority cannot impose a child support obligation on the grandmother's former husband.

[¶ 57] Under the facts of this case, it is clear that if an "equitable adoption" took place, it took place in New Jersey or Kentucky and would therefore be governed by the law of one of those states. This, too, the majority ignores because, as discussed below, neither of those states has recognized "equitable adoption" in a case such as this. The majority ignores jurisdictional implications and comity by attempting to apply a newfound theory of equitable adoption to circumstances that occurred wholly outside this state.

[¶ 58] Although North Dakota has recognized equitable adoption, previous recognition has been limited strictly to matters of inheritance, and then only to cases where the deceased had not expressed a different intent through a valid will.

[¶ 59] The majority places North Dakota among an extremely small minority of states that have recognized equitable adoption for child support, and ignores the cases and the persuasive analysis of the courts that have rejected the concept. The majority establishes precedent embraced by no other court. Specifically, the majority not only suggests imposition of a child support obligation under the auspices of equitable adoption, but it suggests such imposition of a support obligation may be imposed from a non-parent to a non-parent based on a misconceived notion of equity.

[¶ 60] The majority decision builds a foundation upon unsupported ground, and the crumbling result undoubtedly will be impairment of the marital and familial relations of countless non-traditional North Dakota families. The willingness of families to provide foster care or to care for the children of other family members is jeopardized by the majority's holding. The majority creates a mechanism for deadbeat dads or misfit moms seeking to saunter away from child support obligations or, if they resume taking care of their children, to sue for child support from those who, out of the generosity of their hearts, have cared for their children.

[¶ 61] Because this radical departure in jurisprudence is unsupported by the law, is contrary to our statutes and case law, is an abrogation of jurisdiction and comity, and is constitutionally infirm, I dissent.

## I

[¶ 62] The North Dakota legislature has enacted detailed statutory guidelines for adoption proceedings. By recognizing equitable adoption for child support, the majority invades the province of the legislature and abandons our precedent. As detailed below, the statutory basis for adoptions provides stability and certainty of law, as well as protection of a child's best interests.

[¶ 63] "Only a court may issue a final decree of adoption and then, only if it determines that statutory grounds for doing so have been satisfied." *Matter of Adoption of K.A.S.*, 499 N.W.2d 558, 566 (N.D.1993) (citing N.D.C.C. § 14–15–19(3)). The majority concludes, at ¶ 17, "longstanding North Dakota precedent recognizes the doctrine of equitable adoption." As indicated, equitable adoption has been recognized in this state, but its recognition has been strictly for inheritance issues where the deceased has not expressed a contrary intent by will. Applying the intestate probate law to child support is as infirm as applying the uniform commercial code to decide whether someone has committed murder, or applying oil and gas law to decide fault in an automobile accident.

[¶ 64] Our legislature has set forth the statutory scheme for adoption by enacting the Revised Uniform Adoption Act. N.D.C.C. ch. 14–15. A review of our statutes exemplifies how these important statutory provisions accomplish protection of adoptive children as well as the child's natural parents. "In this state there is no common law in any case where the law is declared by the code." N.D.C.C. § 1–01–06. By creating child support obligations under the auspices of equitable adoption, the majority is creating common law and invading the province of the legislature.

## A

[¶ 65] As this Court has noted, "Adoption is a relationship artificially created by statute. The proceedings are wholly statutory and do not depend upon equitable principles." *Borner v. Larson*, 70 N.D. 313, 293 N.W. 836, 839 (1940) (citation omitted). The District of Columbia Court of Appeals has elucidated this point, saying:

> Adoption is a creature of statute, and the legal requirements and procedures incident thereto are fully set forth therein. Formal adoption procedures are for the benefit of the child, and they cannot be circumvented or substituted by other procedures.... Any theory of adoption is based upon the proposition that the child is wanted for its own sake, and not upon the proposition that it is accepted incidentally as a result of marriage to the mother.

*Fuller v. Fuller*, 247 A.2d 767, 769 (D.C.Ct. App.1968).

[¶ 66] Our statutes allow only certain individuals to adopt. N.D.C.C. § 14–15–03. A husband and wife may adopt. If, however, only one spouse seeks to adopt, failure to consent by the other spouse must be "excused by the court by reason of prolonged unexplained absence, unavailability, incapacity, or circumstances consti-

tuting an unreasonable withholding of consent" to allow one spouse alone to adopt. *Id.* Although the majority, at ¶ 26 n.3, concedes that compliance with statutory procedures is preferable, it continues on a course to circumvent the legislature's enactments.

[¶ 67] "Generally, it may be stated that statutes which authorize adoption of a child ... must be construed so as to authorize the adoption only in cases where the parents consent ... the child has been abandoned ... or where for other reasons it is manifestly to the interest of the child that it be taken from their custody." 2 Am.Jur.2d *Adoption* § 10 at 878 (1994) (citations omitted). These protections exist for both the child and the parents:

> So far as the child is concerned, the state, as his protector, may make the change for him, but the rights of the natural parents should be guarded so far as they do not come into conflict with the best interests of the child; when they do, it is the power of the state, by legislation, to separate children from their parents when their interests and the welfare of the community require it.

*Id.*

## B

[¶ 68] Representative of the legislative concern for an adoptee, the State, through the department of human services, must be a respondent for a statutory adoption. N.D.C.C. § 14–15–11(1)(a). Consent is also required from the adoptee's mother. N.D.C.C. § 14–15–05. A presumed father, or a father who has legitimated the minor, must also consent to adoption. *Id.* Further, a minor over the age of ten must consent to an adoption "unless the court in the best interest of the minor dispenses with the minor's consent." *Id.*

[¶ 69] Although consent is not required from a parent who has deserted a child, the record reflects no attempt to obtain consent, or even to inform David or Michelle Clayton of the attempt to effect an equitable adoption. N.D.C.C. § 14–15–06.

To establish abandonment—a question of fact—the intent to abandon must also be established. *Matter of Adoption of Gotvaslee,* 312 N.W.2d 308, 315 (N.D.1981). Here, not only is Antonyio Johnson's consent not established, the consent of the minor child and her parents is also absent. The trial court made no findings on the issues of consent or abandonment, and such findings would be necessary on remand as noted below.

## C

[¶ 70] Our statutes also reflect protection of a child's best interests through imposition of child support. The liability of a stepparent to support a stepchild is clearly defined by North Dakota law:

> A stepparent is not bound to maintain the spouse's dependant children, as defined in section 50–09–01, unless the child is received into the stepparent's family. If the stepparent receives them into the family, the stepparent is liable, to the extent of the stepparent's ability, to support them during the marriage and so long thereafter as they remain in the stepparent's family. Such liability may be enforced against the stepparent by any person furnishing necessaries to such children. If the children are received into the stepparent's family and supported by the stepparent, it is presumed that the stepparent does so as a parent, in which case the children are not liable to the stepparent for their support, nor the stepparent to them for their services. The legal obligation of a natural or adoptive parent to support that person's children is not affected by the liability imposed upon their stepparent by this section.

N.D.C.C. § 14–09–09. Neither parent nor stepparent is defined by our statutes. Section 14–17–01, N.D.C.C., defines the relationship of parent and child as "the legal relationship existing between a child and the child's natural or adoptive parents incident to which the law confers or imposes rights, privileges, duties, and obligations.

It includes the mother and child relationship and the father and child relationship."

[¶ 71] Although section 14–09–09 does not apply to a step-grandparent, the statute essentially codifies the duties of a stepparent who is *in loco parentis*. A stepparent who is *in loco parentis* assumes a parental status and discharges parental duties. *Fuller v. Fuller*, 247 A.2d 767, 770 (D.C.Ct.App.1968) (citation omitted). A stepparent who is *in loco parentis*, once divorced, no longer has a duty to support a stepchild unless the *in loco parentis* relationship continues. *Id.*

[¶ 72] The rationale of section 14–09–09 is simple: absent adoption, stepparents are not liable to support stepchildren once the stepparent-stepchild relationship is severed. The rationale is further emphasized in *Miller v. Miller*, 97 N.J. 154, 478 A.2d 351, 358 (1984):

> A stepparent who tried to create a warm family atmosphere with his or her stepchildren would be penalized by being forced to pay support for them in the event of a divorce. At the same time, a stepparent who refused to have anything to do with his or her stepchildren beyond supporting them would be rewarded by not having to pay support in the event of divorce.

Although the terms of section 14–09–09 clearly do not apply here, the public policy of the statute and the public policy announced in *Miller* do apply. Once Madonna Johnson obtained temporary custody of Jessica Clayton, Antonyio Johnson could have refused to have anything to do with the child. Or, alternatively, he could have provided a warm family atmosphere by providing support and love.

[¶ 73] It is illogical to apply the public policy of section 14–09–09 to a stepparent, but not to a step-grandparent when the step-grandparent is *in loco parentis*. If such discriminate application of this public policy were employed, child support could be imposed under the auspices of equitable adoption upon essentially any person other than a parent or stepparent. For example, a relative, a friend, a sibling, a babysitter, a daycare worker, a foster parent, or anyone who assumes parental authority and discharges parental duties with the intent to serve as a surrogate mother or father could, under our newfound "equitable adoption" criteria, be liable for child support.

[¶ 74] The majority, however, concludes, at ¶ 30, that section 14–09–09 does not apply because "the circumstances in the case presently before us are not those contemplated by N.D.C.C. § 14–09–09." The majority continues, at ¶ 31, stating "love, affection, kindness and generosity" are encouraged between a stepparent and stepchild. The majority states, at ¶ 31:

> It would be contrary to our state's public policy to undermine the development of such relationships by encumbering a normal stepparent-stepchild relationship with the threat of child support obligations which go beyond that required by N.D.C.C. § 14–09–09. Stepparents in this state might refrain from taking their spouses' children into their homes, for fear that their kindness could result in the accrual of a burdensome obligation. We recognize, given the increased prevalence of blended families in our society, such a result would be detrimental to many children in this state.

Then, at ¶ 32, the majority concludes the present circumstances are not a "normal stepparent-stepchild relationship envisioned by that statute."

[¶ 75] If the policy underlying section 14–09–09 were applied to this case, Antonyio Johnson's support obligations to Jessica Clayton would cease because she is no longer in his home. The majority's desire to protect stepparent-stepchild relationships, like the rationale of *Miller*, is laudable. However, by refusing to apply the public policy as expressed in section 14–09–09 to the facts of this case, the majority decision obtains exactly what it proclaims it seeks to prevent.

[¶ 76] In the absence of a statute expressly addressing the issue, "making social policy is a job for the Legislature, not the courts ... [t]his is especially true when the determination or resolution requires placing a premium on one societal interest at the expense of another: 'The responsibility for drawing lines in a society as complex as ours—of identifying priorities, weighing the relevant considerations, and choosing between competing alternatives—is the Legislature's, not the judiciary's.'" *Van v. Zahorik*, 460 Mich. 320, 597 N.W.2d 15, 18 (1999) (citations omitted).

### D

[¶ 77] Further invading the province of the legislature, the majority concludes that imposition of child support is not precluded under our law. A child is defined, under the Revised Uniform Adoption Act, as "a son or daughter, whether by birth or adoption." N.D.C.C. § 14–15–01(3); *see also* N.D.C.C. § 1–01–18 ("The term 'children' includes children by birth and by adoption."). For purposes of child support, a "child" is defined as "any child, by birth or adoption, to whom a parent owes a duty of support." N.D. Admin. Code § 75–02–04.1–01(1). The majority, discussing N.D. Admin. Code § 75–02–04.1–01(1) at ¶ 33, states:

> The regulation does not state that such an obligation may be imposed only in cases where a child has been adopted according to statutory procedures. In addition, we believe our state's public policy of promoting the well-being of children, which is expressed through the guidelines, supports the imposition of a child support obligation on an equitable parent when the circumstances of the case require it.

[¶ 78] The majority concludes, from the absence of language addressing a doctrine that has been neither legislatively enacted nor previously adopted by this Court nor adopted by a large enough percentage of states to even be classified a minority, that the legislature intended to include "equitable adoption" when it stated "adoption." "Words ... must be construed according to the context and the rules of grammar and the approved usage of the language. Technical words ... as have acquired a peculiar and appropriate meaning in law, or as are defined by statute, must be construed according to such peculiar and appropriate meaning or definition." N.D.C.C. § 1–02–03; *see also* N.D.C.C. § 1–02–05 ("When the wording of a statute is clear and free of all ambiguity, the letter of it is not to be disregarded under the pretext of pursuing its spirit.").

[¶ 79] If "equitable adoption" and "adoption" mean the same thing, the equitable adoption posited by the majority would be ineffective because it did not comply with the statutory prerequisites for a valid adoption. However, the majority concludes the legislature did not intend "stepparent" to include "step-grandparent," but it did intend "adoption" to include "equitable adoption."

[¶ 80] Our child support guidelines reflect the continuing obligation of a parent whose child is in foster care or guardianship care. N.D. Admin. Code § 75–02–04.1–11. "Parents of a child subject to a guardianship order under North Dakota Century Code chapter 27–20 or 30.1–27 remain financially responsible for the support of that child." *Id.* The majority ignores the natural parents' obligation to their child, in favor of imposing that duty upon a child's former step-grandparent.

### E

[¶ 81] The majority states, at ¶ 39 n.4:

> We conclude an equitable adoption may occur without termination of the natural parents' parental rights. It would be antithetical to impose such a requirement on a doctrine, the existence of which is based on the noncompliance with other procedures.

Implicit in our previous holdings recognizing equitable adoption is the fact that the natural parents of the equitably adopted

child were unavailable. Likewise, the cases used by the majority in support of its conclusion recognize that either the natural parent's rights have been terminated or the natural parent is no longer available. Here, David and Michelle Clayton's parental rights have not been previously terminated and both natural parents are presumably available. In addition, our case law and statutes suggest a similar conclusion.

[¶ 82] Before an adoption can be granted, the parental rights of the natural parents must be terminated. *Matter of Adoption of J.M.H.*, 1997 ND 99, ¶ 6, 564 N.W.2d 623 (citing *Matter of Adoption of A.M.M.*, 529 N.W.2d 864, 866 (N.D.1995); N.D.C.C. ch. 14–15). Except with respect to a petitioner's spouse, an adoption decree terminates the parental rights of the natural parents. *Matter of Adoption of J.W.M.*, 532 N.W.2d 372, 376 n. 3 (N.D. 1995) (citing N.D.C.C. § 14–15–14).

[¶ 83] Involuntary termination of parental rights may occur under three provisions of North Dakota law. *See Adoption of K.A.S.*, 499 N.W.2d 558, 560 (N.D.1993) (identifying the three provisions: (1) the Uniform Juvenile Court Act, (2) the Uniform Parentage Act, and (3) the Revised Uniform Adoption Act). This Court has recognized that the Juvenile Court Act and the Parentage Act "give a party the right to legal counsel at all stages of the proceedings, and require the trial court to appoint counsel for a party who is financially unable to obtain counsel." *Id.* at 561 (citing N.D.C.C. §§ 27–20–26, 14–17–18). Recognizing that the Uniform Adoption Act had no similar provision, this Court stated, "[T]ermination of the parental rights of an indigent parent who has been denied appointment of counsel would run afoul of the equal protection provision of our state constitution." *Id.* at 563.

[¶ 84] Any conclusion that Antonyio Johnson has equitably adopted Jessica Clayton, when both natural parents are still available to provide support, would necessarily allow Antonyio Johnson to ob-tain custody of Jessica Clayton as the majority says at ¶ 18.

F

[¶ 85] The majority ignores the possible constitutional implications of its decision. "It is also well established that parents have a fundamental right to their children which is of a constitutional dimension." *In Interest of L.J.*, 436 N.W.2d 558, 561 (N.D. 1989) (citing *Kleingartner v. D.P.A.B.*, 310 N.W.2d 575, 578 (N.D.1981)). Although the natural parent's rights are not absolute or unconditional, "[d]ue process provides certain procedural protections before the relationship may be terminated." *In the Interest of A.S.*, 1998 ND 181, ¶ 14, 584 N.W.2d 853 (citing *Matter of Adoption of J.W.M.*, 532 N.W.2d 372, 375 (N.D.1995)).

[¶ 86] It is "straightforward" that the strict scrutiny standard applies to statutes allowing termination of parental rights. *K.A.S.*, 499 N.W.2d at 564. "It is beyond question in this jurisdiction that parents have a fundamental constitutional right to parent their children which is of the highest order." *Id.* (citations omitted). This highest standard of review for statutory review requires the state to prove it has a compelling interest that justifies burdening a parent's "fundamental right to enjoy a relationship with his or her child." *Id.* at 565.

[¶ 87] We have repeatedly held that termination of parental rights, under the Uniform Juvenile Court Act, requires satisfaction of a three-part test. *In the Interest of A.S.*, 1998 ND 181, ¶ 15, 584 N.W.2d 853 (the three-part test requires showing deprivation, showing that the cause of the deprivation will continue, and showing that the child is suffering or will suffer serious physical, mental, or emotional harm). All three parts of this test must be proven by clear and convincing evidence. *Id.* Notwithstanding our precedent, our procedural protections, our higher evidentiary proof standards, and the constitutional due process concerns, the majority remands this matter to the district court for a determi-

nation of whether the facts of this case support the theory of equitable adoption.

[¶ 88] North Dakota has adopted the Uniform Child Custody Jurisdiction Act. Implicit within the act is the due process requirement that before a custody determination can be made, notice and an opportunity to be heard must be given to any contestant or to "any parent whose parental rights have not been previously terminated." N.D.C.C. § 14–14–04. "If any of these persons are outside this state, notice and opportunity to be heard must be given pursuant to section 14–14–05." *Id.* Likewise, under this State's adoption of the Uniform Parentage Act, notice requirements are implicit for adoption proceedings or termination of parental rights. N.D.C.C. §§ 14–17–23, 14–17–24.

[¶ 89] Not surprisingly, considering there was apparently no attempt to notify David or Michelle Clayton, the record has no evidence that these procedural and constitutional safeguards were employed. The majority concludes the formalities required for compliance with our precedent and the constitution would be "antithetical" and it would be an imposition to require compliance with requirements such as simply notifying the natural parents. Even if it is an imposition, our constitution and due process concerns require notice, an opportunity to be heard, and heightened procedural requirements when fundamental rights are implicated.

[¶ 90] The constitution requires that a fundamental right cannot be abrogated with less than exacting scrutiny. Here, concluding an equitable adoption may occur without the formal requisites required for termination of parental rights—without even notifying the parents—is constitutionally infirm.

## II

[¶ 91] Certainly the doctrine of equitable adoption has been used in North Dakota, but it has not been used in the same context as the majority opinion. In each of the North Dakota cases cited by the majority, this Court used equitable adoption only in the context of inheritance; the cases did not impose a duty of child support upon a step-grandparent who provided support to a disadvantaged child.

[¶ 92] The majority relies on three cases from other jurisdictions to support its conclusion that equitable adoption should be applied here: *Wener v. Wener*, 35 A.D.2d 50, 312 N.Y.S.2d 815 (N.Y.App.Div.1970); *Frye v. Frye*, 103 Nev. 301, 738 P.2d 505 (1987); and *Geramifar v. Geramifar*, 113 Md.App. 495, 688 A.2d 475 (1997). These three cases, only two of which are pronouncements from the highest court of each of the three jurisdictions, are exceptionally dissimilar to the circumstances in this case to which the majority attempts to apply them.

### A

[¶ 93] *Wener* is a lower appellate court decision that has been thrice distinguished: *Landon v. Motorola, Inc.*, 38 A.D.2d 18, 326 N.Y.S.2d 960 (N.Y.App.Div.1971); *V.L.P. v. J.S.S.*, 407 A.2d 244 (Del.Fam.Ct. 1978); *Miller v. Miller*, 97 N.J. 154, 478 A.2d 351 (1984). Importantly, in *Wener*, and quite distinguishable from this case, the court stated, "the child's natural parents are unknown." 312 N.Y.S.2d at 817.

[¶ 94] In *V.L.P.*, the Family Court of Delaware, discussing a foster father's duty to support his wife's child, stated, "in the absence of an adoption, the duty of a father to support an illegitimate child ceases upon termination of the marriage." 407 A.2d 244, 250 (Del.Fam.Ct.1978) (citing *Fuller v. Fuller*, 247 A.2d 767 (D.C.App. 1968)). "Specifically," the court stated, "the natural father ... could still be sued for support." *Id.* Likewise here, David Clayton and Michelle Clayton, as natural parents of Jessica, have a superior obligation to provide support.

[¶ 95] The *V.L.P.* court continued, "a foster father, upon the termination of his marriage, had no obligation to support a foster child." *Id.* (citing *Sargeant v. Sar-*

*geant*, 88 Nev. 223, 495 P.2d 618 (1972)). "[A] foster parent may abandon the position of *loco parentis* at any time." *Id.* The duty "to support a stepchild continues only as long as that relationship continues. Thus a divorce terminates the relationship." *Id.*

[¶ 96] The New Jersey Supreme Court, discussing *Wener* and other cases permitting equitable adoption, stated, "These cases are easily distinguishable from the present case since, of course, here there are two natural parents, at least one of whom is present and another, while absent, may still be available." *Miller v. Miller*, 97 N.J. 154, 478 A.2d 351, 357 (1984). The court distinguished cases in which a child relied on stepparent support because the child never knew of his or her natural parents and had no place to turn if the new parents no longer wished to support the child. *Id.* At ¶ 4, the majority concedes that Jessica Clayton knew of her true parentage, although she may have believed the Johnsons adopted her.

[¶ 97] The *Miller* court continued, stating stepparent support may be ordered under the doctrine of equitable estoppel, with the caveat, "[T]his doctrine should be applied with caution. Voluntary support by a stepparent should not be discouraged." 478 A.2d at 358. In further analyzing the doctrine of equitable estoppel, the court stated:

> [N]o court has ever applied equitable estoppel to force a husband to support the children of his divorced spouse merely because he developed a close relationship with the children, nurtured them into a family unit with himself as the father, and had the children call him "daddy." We decline to be the first to set such a precedent.
>
> . . . .
>
> A stepparent who tried to create a warm family atmosphere with his or her stepchildren would be penalized by being forced to pay support for them in the event of a divorce. At the same time, a stepparent who refused to have anything to do with his or her stepchildren beyond supporting them would be rewarded by not having to pay support in the event of divorce.

*Id.*

[¶ 98] Here, the majority suggests that Antonyio Johnson may be penalized for his generosity and close association with Jessica Clayton. To harmonize the family unit after Madonna Johnson took in her son's child and obtained temporary custody, Antonyio Johnson provided food, shelter, clothing, education, and assistance for Jessica for over ten years. The *Miller* court emphasized:

> [T]he natural parent should always be considered the primary recourse for child support because society and its current laws assume that the natural parent will support his or her child. It is only when a stepparent by his or her conduct actively interferes with the children's support from their natural parent that he or she may be equitably estopped from denying his or her duty to support the children.

478 A.2d at 359.

[¶ 99] Here, not only is the record devoid of any indications that support was sought through Jessica Clayton's natural parents, but there is no finding that Antonyio Johnson actively interfered with Jessica Clayton's right to seek support from her natural parents. On remand, as identified in *Miller*, a finding that Antonyio Johnson did actively interfere with Jessica Clayton's opportunity to obtain support from David and Michelle Clayton will be essential for a finding of equitable estoppel. The opposite finding seems already implicit in the district court's reasoned analysis which suggests that Jessica Clayton can seek support from her natural parents and can seek assistance from authorities to enforce such obligations.

**B**

[¶ 100] The majority also cites *Frye v. Frye*, 103 Nev. 301, 738 P.2d 505 (1987), as support that equitable adoption can im-

pose a duty of child support even though the adoption was never finalized. Unlike here, in *Frye* the natural father's parental rights were terminated. *Id.* The court, underscoring the importance of termination of parental rights, stated the act of terminating parental rights "left Amanda without any legal father to whom she may look for financial support." *Id.* at 506. Jessica Clayton certainly can seek financial support from her natural father, David Clayton, or her natural mother, Michelle Clayton. The majority, without support or reflection on the cases it cites for support, concludes in ¶ 39 n.4 that "equitable adoption may occur without termination of the natural parents' parental rights."

[¶ 101] Like *Wener, Frye* has been subsequently distinguished. *See Fenn v. Fenn,* 174 Ariz. 84, 847 P.2d 129 (Ariz.App. Div. 1 1993); *Russo v. Gardner,* 114 Nev. 283, 956 P.2d 98 (1998). In *Fenn,* the Arizona Appellate Division stated that Arizona courts have applied equitable adoption or adoption by estoppel "only when a child seeks to inherit from the estate of a person who had previously entered an adoption contract with the child's natural parents that, except for statutory formalities, was fully performed during the decedent's lifetime." *Fenn,* 847 P.2d at 133 (citations omitted). The elements of equitable adoption "are specific to inheritance cases, and no Arizona court has attempted to recast them in the context of child support." *Id.*

[¶ 102] The Supreme Court of Nevada, reviewing its decision in *Frye,* has stated it "applied the equitable adoption doctrine in upholding a child support obligation" and "limited the application of the equitable adoption doctrine to the specific facts of that case." *Russo v. Gardner,* 114 Nev. 283, 956 P.2d 98, 102 (1998) (citing *Frye,* 103 Nev. at 301, 738 P.2d at 505). Therefore, even though the doctrine was embraced in one very narrow circumstance by the Nevada Supreme Court, that court has confirmed the holding is quite limited.

C

[¶ 103] The majority also relies on *Geramifar v. Geramifar,* 113 Md.App. 495, 688 A.2d 475 (1997), to embrace the doctrine of equitable adoption. The factual dissimilarities of *Geramifar* to this case are not fully explored in the majority opinion. In *Geramifar,* a married couple residing in Maryland traveled to Iran, their native country, to adopt a child. *Id.* at 476. The couple obtained a temporary guardianship of a child in Iran and returned to the United States. *Id.* The couple did not initiate adoption proceedings in the United States. *Id.* The couple later separated and entered into a "bitter custody dispute." *Id.* Shortly before the custody hearing, the father agreed the mother should have custody, and he waived his right to adopt and right to visitation. *Id.* at 476–77.

[¶ 104] As noted by the majority, the Maryland Court of Appeals has extended equitable adoption to impose child support obligations. *Id.* at 477–78. Concluding that the husband and wife had journeyed to the Republic of Iran and contracted to adopt, and provided mutual promises to each other and the Republic of Iran, the court held that an equitable adoption occurred. *Id.* at 478.

[¶ 105] A husband and wife agreeing to travel abroad to adopt a child, coupled with the resulting custody dispute, certainly may be distinguished from a stepgrandparent agreeing to temporarily care for the grandchild of his spouse. *See Ceglowski v. Zachor,* 102 F.Supp. 513 (D.N.D.1951) (identifying similar circumstances where a couple traveled to Germany, obtained a child, and were held to have equitably adopted that child; cited by the majority at ¶ 16). Enforcement of an obligation such as that recognized in *Geramifar* is much more palpable considering that a child has been taken from his native country, has been brought to a new land, and can no longer seek support from his natural parents. Unlike the equitable

remedy in *Geramifar,* the legal remedy in this case is still possible.

## III

[¶ 106] The majority fails to acknowledge that the vast majority of states do not recognize child support obligations as a result of an "equitable adoption." Only a few states have done so, and only under very limited and cautious circumstances. The vast majority rule, however, is to not impose child support obligations upon a non-parent under the auspices of equitable adoption.

### A

[¶ 107] In *Prager v. Smith,* 195 A.2d 257, 259 (D.C.Ct.App.1963), the doctrine of equitable adoption was rejected. The court found that a natural father could not assert that he was no longer obligated to pay child support because the child's mother and her present husband engaged in conduct constituting an equitable adoption. *Id.* The court, citing long-established principles, stated the obligation "of a natural father to support his minor children is not simply a moral obligation but is a duty imposed by law." *Id.*

[¶ 108] The majority decision casts the *Prager* rationale and our own longstanding jurisprudence into murky waters. The doctrine of equitable adoption can now be used as a sword to pierce the proverbial shield that our child support laws have provided for children of broken homes. With our consent requirements abrogated, a deadbeat dad or misfit mom can use the conduct of stepparents, who seek to mend the deleterious effects of a broken home, to cast aside their own obligations and impose them on another.

[¶ 109] In a subsequent case, the District of Columbia Court of Appeals was again called upon to decide the issue. In *Fuller v. Fuller,* 247 A.2d 767 (D.C.Ct.App.1968), a man married a woman who was four months pregnant by another man. *Id.* at 768. The husband promised to care for the child, to provide a good marital home, and to include the child as part of the family unit. *Id.* A month after the child's birth, the husband had his name recorded as father on the child's birth certificate. *Id.* at 769. The father "treated the infant girl 'in all matters as though she were his natural child.'" *Id.*

[¶ 110] The court, referring to these facts, stated, "but such conduct is not tantamount to adoption." *Id.* The court continued:

> Adoption is a creature of statute, and the legal requirements and procedures incident thereto are fully set forth therein. Formal adoption procedures are for the benefit of the child, and they cannot be circumvented or substituted by other procedures. No matter what the beliefs of the parties may have been, appellee did not, by taking the child into the family circle, effect an adoption of her, thereby imposing upon him the attendant continuing obligation of support and entitling the child to certain other legal rights. Any theory of adoption is based upon the proposition that the child is wanted for its own sake, and not upon the proposition that it is accepted incidentally as a result of marriage to the mother. (Citations omitted).

*Id.* The court found the doctrine of equitable estoppel did not apply. *Id.*

[¶ 111] The court further discussed the application of *in loco parentis,* stating it means one who places himself in the position of assuming parental status and discharging parental duties. *Id.* at 770. The court stated the father did stand *in loco parentis* to the child and had a duty to support the child. *Id.* However, the court found that status "may be abrogated by him at any time." *Id.* (citations omitted). Once divorced, and "the child is no longer under the stepfather's care, his duty of support terminates in the absence of a showing that he intends to continue as one *in loco parentis.*" *Id.*

[¶ 112] The *Fuller* analysis is applicable here. The district court found Antonyio

Johnson had assumed parental obligations and discharged parental duties. Antonyio Johnson was effectively *in loco parentis*. However, upon the Johnson's divorce, absent a showing that Antonyio Johnson intended to continue *in loco parentis,* his duty ceased. As noted, this conclusion is supported by the public policy of our statutes. N.D.C.C. § 14–09–09.

### B

[¶ 113] The doctrine of equitable adoption, or virtual adoption, has been limited to inheritance cases in Georgia. *Dep't of Human Resources v. Tabb,* 221 Ga.App. 766, 472 S.E.2d 540, 541 (1996). The court held that when a stepfather sought and obtained consent for adoption from the natural father and later abandoned the adoption attempt, the natural father was not discharged from his support obligation. *Id.* The court specifically found that equitable adoption "is not applicable to a dispute as to who is legally responsible for the support of minor children." *Id.* (citing *Ellison v. Thompson,* 240 Ga. 594, 596, 242 S.E.2d 95 (1978)).

[¶ 114] We too previously held that attempts to contract away parental obligations are without effect. *Hobus v. Hobus,* 540 N.W.2d 158, 161 (N.D.1995). In fact, we reiterated that parents "who attempt to alter their parental responsibilities may be subject to criminal sanctions. 'No parent may assign or otherwise transfer his rights or duties with respect to the care and custody of his child. Any such transfer or assignment, written or otherwise, is void.'" *Id.* (citing N.D.C.C. § 14–10–05); *see also id.* (such action constitutes a class A misdemeanor).

### C

[¶ 115] In *Otero v. City of Albuquerque,* 125 N.M. 770, 965 P.2d 354 (Ct.App.1998), the court stated it has recognized equitable adoption but "only when strict requirements have been satisfied." *Id.* at 357. The court declined to extend equitable adoption to allow a child to sue based on the alleged wrongful death of his stepfather. The stepfather, Norman Otero, married the mother of John Otero when John was five-and-one-half years old. *Id.* at 356. When John turned sixteen, he legally changed his surname to Otero. *Id.* Norman Otero "cared for and raised John with great love and affection." *Id.* Norman Otero "performed the duties of a father, including coaching John's sports teams, leading John's 4–H activities, and attending teachers' meetings, first communion, and other important events in John's life." *Id.*

[¶ 116] Notwithstanding the fact that Norman and John Otero were together for over ten years, effectively as father and son, the court concluded "strict limitations on recognition of equitable adoption remain justified" under modern scrutiny. *Id.* at 360.

[¶ 117] The court stated the formality of court-approved adoptions, as provided by statute, are advantageous. *Id.* This formality provides "certainty in the law. If proof of a loving relationship can by itself entitle a person to the benefits of being a child under the law, one could anticipate frequent litigation in which parties dispute the intimacies of family life." *Id.* "In addition, the statutory adoption procedure is designed to protect children from being adopted by unsuitable persons." *Id.* (citations omitted). "Unconstrained recognition of equitable adoption would undermine this legislative purpose, making compliance with statutory procedures unnecessary, and even unattractive, for prospective parents." *Id.* "Finally, statutory adoption, as opposed to an informal procedure, clarifies the rights and obligations of the natural parent who may be supplanted by the adoptive parent." *Id.* at 360–61 (citation omitted).

[¶ 118] Because *Otero* was a tort case, the court found it particularly problematic to apply the doctrine of equitable adoption. *Id.* at 361–62. Likewise, the court found it

particularly problematic that the relationship of stepparent-stepchild was involved and stated, "that relationship calls for particular *circumspection before recognizing an equitable adoption.*" *Id.* at 362. The court stated the doctrine of equitable adoption is seldom used by courts in this context because "it is in the public interest for stepparents to be generous and loving with their stepchildren. Such conduct could be discouraged if a consequence of such kindness toward a stepchild would be the imposition on the stepparent of the legal incidents of parenthood, such as a duty to provide child support after divorce or a reallocation of the stepparent's estate after death." *Id.* (citations omitted).

[¶ 119] "When the alleged adopter is the child's stepparent the courts almost invariably find the proof insufficient on the grounds that the conduct of the parties was as consistent with the normal stepparent-stepchild relationship as it was with the contract to adopt." *Id.* (citing *Jan Ellen Rein, Relatives by Blood Adoption, and Association: Who Should Get What and Why*, 37 Vand. L.Rev. 711, 781–82 (1984)).

[¶ 120] The *Otero* court stated "although Norman expressed an interest in adopting John shortly after the marriage, he never did so." *Id.* at 363. Standing alone, Antonyio Johnson's prior interest in adopting Jessica Clayton and his efforts to do so, as well as his efforts to harmonize the marital family, do not amount to an adoption.

## IV

[¶ 121] The majority also fails to recognize that it is the law of either Kentucky or New Jersey—not the law of North Dakota—that should be applied to determine whether an adoption has occurred. This state will recognize a valid adoption of another jurisdiction as long as the rendering court had jurisdiction and afforded the parties due process protections. N.D.C.C. § 14–15–17; *cf. Pearson v. Pearson*, 2000 ND 20, ¶ 8, 606 N.W.2d 128 (a common law marriage validly entered into in another jurisdiction would be recognized in North Dakota even though our statutes do not allow common law marriage).

[¶ 122] Under our choice of law analysis for contracts, we use a significant contacts approach coupled with "choice influencing considerations." *Plante v. Columbia Paints*, 494 N.W.2d 140, 141–42 (N.D. 1992). In a contract case, as suggested here by the majority, we look to the following factors: (1) the place of contracting; (2) the place of negotiation of the contract; (3) the place of performance; (4) the location of the subject matter of the contract; and (5) the domicile, residence, nationality, place of incorporation and place of business of the parties. *Id.*, 494 N.W.2d at 142 (citing *Restatement (Second) of Conflict of Laws* § 188 (1971)).

[¶ 123] The record establishes an adoption was attempted in New Jersey in July of 1990. That effort was abandoned, and another effort was made sometime thereafter in Kentucky. That effort was also abandoned in 1993. The facts used by the majority to support an equitable adoption relate to events that transpired in either New Jersey or Kentucky.

[¶ 124] The majority has not analyzed these considerations, and it objectively appears that our precedent would mandate the application of another forum's law because the alleged contract arose in either Kentucky or New Jersey and was performed in either of those states, the subject matter was in either of those states, and the domicile of all parties was in either of those states at the time the alleged contract was made.

[¶ 125] As noted, the Supreme Court of New Jersey will impose an obligation of support on a stepparent on the basis of equitable estoppel, but not when "there are two natural parents, at least one of whom is present and another, while absent, may still be available." *Miller v. Miller*, 97 N.J. 154, 478 A.2d 351, 357 (1984).

[¶ 126] The State of Kentucky has not embraced the doctrine of equitable adoption. In any event, any factual determination necessarily requires a further determination of which law to apply in order to ascertain whether an equitable adoption was in fact effectuated. The appropriate course would be to present the facts of this case in the form of a certified question to the appropriate jurisdiction in order to apply the appropriate law rather than remand to the district court for such an analysis. *Mau v. National Union Fire Ins. Co.*, 2000 ND 97, ¶ 1, 610 N.W.2d 761. Even if this Court were to embrace the theory suggested by the majority, the facts presented by this case cannot be used to adopt the proposition because the underlying dispute mandates an application of the law of another jurisdiction.

V

[¶ 127] Madonna Johnson and Jessica Clayton have never lived in North Dakota. Antonyio Johnson came to North Dakota only when the marriage was coming to an end. A determination of equitable adoption should be made in Kentucky by declaratory judgment or other proceeding. Other courts have employed the declaratory judgment procedure to determine the status of an equitably adopted child. In *Keiser v. Wiedmer*, the court held a declaratory judgment action "is maintainable, independent of any controversy relating to rights growing out" of the status of an equitably adopted child. 263 S.W.2d 63, 66 (Mo.Ct.App.1953).

[¶ 128] The majority ignores the jurisdictional and comity concerns of determining an equitable adoption in this case under our law. Foremost, our cases establish that child support is for the benefit of the child, not for the benefit of the child's custodian. *Hendrickson v. Hendrickson*, 1999 ND 37, ¶ 10, 590 N.W.2d 220, 223 (citing *Schleicher v. Schleicher*, 551 N.W.2d 766, 769 (N.D.1996)). Therefore, any benefit accruing under the alleged contract is for Jessica Clayton's benefit, not for the benefit of Madonna Johnson. Any contractual obligation arising between Jessica Clayton and Antonyio Johnson must be adjudicated between them rather than between Antonyio and Madonna Johnson.

[¶ 129] Although the district court had jurisdiction over the divorce proceedings in this matter, and although it likely had jurisdiction to determine incidental issues relative to the divorce, the district court did not have jurisdiction to adjudicate contract claims of Antonyio Johnson's former step-granddaughter. The facts are clear. Jessica Clayton is not related to Antonyio Johnson. Jessica Clayton and Madonna Johnson were residing in Kentucky prior to this action. The record suggests that neither she nor Madonna Johnson have ever resided in this state. The purported contract arose in New Jersey or Kentucky, and no performance under that contract occurred in North Dakota. Because Jessica Clayton was not a party to the divorce action, and because she did not join the litigation, the district court was without jurisdiction to adjudicate the purported contract claim. I would dismiss the child support claim for lack of jurisdiction.

A

[¶ 130] The parties married in England in 1986 and resided there until 1987 while both served in the Air Force. The parties lived in New Jersey from November of 1987 through November of 1991. In August of 1990, Antonyio Johnson deployed for participation in the Desert Storm campaign in the Persian Gulf. He was then assigned to the Azores and resided there from November of 1991 until February of 1993. He was stationed in Florida from February of 1993 until May of 1997. He then served in Korea until he was assigned to the Grand Forks Air Force Base in May of 1998.

[¶ 131] Madonna Johnson and Antonyio Johnson had not lived together since Antonyio was assigned to his tour in Korea. Madonna Johnson retired from military

service in February of 1992. The record and briefs of the parties indicate Madonna Johnson moved to Louisville, Kentucky, following her retirement and while Antonyio Johnson was stationed in Korea. In July of 1998, after his assignment to the Grand Forks Air Force Base, Antonyio Johnson filed for divorce in the district court in Grand Forks. The district court tried the case on March 3, 1999.

### B

[¶ 132] Our divorce statutes require that a party seeking a divorce reside in this state for six months preceding commencement of an action for divorce. N.D.C.C. § 14-05-16. Alternatively, "a divorce may be granted if the plaintiff in good faith has been a resident of this state for the six months immediately preceding entry of the decree of divorce." *Id.* Antonyio Johnson resided in North Dakota from June of 1998 until the district court entered a divorce decree in March of 1999, and he therefore satisfied the statutory residency requirement.

[¶ 133] The record, however, reflects that Madonna Johnson has never resided in North Dakota. This state has long recognized the divisible divorce doctrine which allows dissolution of a marriage as an in rem proceeding affecting the marital status without regard to adjudication of the incidences of divorce. As stated in *Smith v. Smith*, 459 N.W.2d 785, 787 (N.D. 1990):

> Divorce proceedings typically contain two principal components: (1) the dissolution of the marital status, and (2) the adjudication of the incidences of the marriage. The "divisible divorce" doctrine recognizes that each of these components have "distinct and separate jurisdictional foundations."

(citing *Hall v. Hall*, 585 S.W.2d 384, 385 (Ky.1979)). Marital dissolution is an in rem proceeding that allows a court to change the marital status "even when only one party to the marriage is a resident of the state in which the court is located." *Id.* (citations omitted).

[¶ 134] However, "meeting the jurisdictional requirements to sever the marital status itself 'does not necessarily grant the court the authority to adjudicate the related inciden[ces] of the marriage.'" *Id.* at 788 (citing *Byzewski v. Byzewski*, 429 N.W.2d 394, 397 (N.D.1988)).

### 1

[¶ 135] "A court has personal jurisdiction over a person if the person has reasonable notice that an action has been brought and sufficient connection with the forum state to make it fair to require defense of the action in the state." *Larson v. Dunn*, 474 N.W.2d 34, 38–39 (N.D.1991) (citing *Smith*, 459 N.W.2d 785 (N.D.1990)). Personal jurisdiction is obtained by the court if "there exists certain minimum contacts" such as satisfaction of a statutory "long-arm" provision or by a nonresident's failure to object to the assertion of personal jurisdiction. *Smith*, 459 N.W.2d at 789. Personal jurisdiction, unlike subject matter jurisdiction, can therefore be waived. *Larson*, 474 N.W.2d at 39.

[¶ 136] In this case, the record reflects no objection by Madonna Johnson to the district court exercising personal jurisdiction over this divorce. To preserve a personal jurisdiction argument, a party must object to the court's jurisdiction and specially appear to contest the jurisdiction. N.D.R.Civ.P. 12(b). Once a party makes a voluntary appearance, without asserting the lack of personal jurisdiction, the court may proceed to adjudicate the matter before it. *Larson*, 474 N.W.2d at 39. Here there apparently was no objection to the court's personal jurisdiction over Madonna Johnson, thus the district court had personal jurisdiction to adjudicate claims between Antonyio and Madonna Johnson.

### 2

[¶ 137] On the other hand, "[s]ubject matter jurisdiction cannot be conferred by the parties' agreement, consent, or waiver." *Id.* "A judgment or order entered

without the requisite jurisdiction is void." *Id.* Subject matter jurisdiction allows a court to try an action "if the constitution and laws authorize that court to hear the type of cases to which the particular action belongs." *Id.* at 38 (citations omitted). District courts in North Dakota have broad jurisdictional authority, including authority to decree a divorce. N.D.C.C. §§ 27–05–06, 14–05–01(2).

[¶ 138] By obtaining personal jurisdiction over Madonna Johnson, the district court was also able to adjudicate the incidences of the marriage, including spousal support and property distribution. " 'Before adjudicating the incidences of the parties' marriage,' a trial court 'is required to obtain *in personam* jurisdiction over both [of the spouses].' " *Smith*, 459 N.W.2d at 788 (citations omitted). If personal jurisdiction had not been obtained over Madonna Johnson, the district court could only have dissolved the marriage; it could not have adjudicated matters of spousal support, property distribution, and the like. *Id.* at 788–89 (citations omitted). Because there appears to be no objection to personal jurisdiction, the district court additionally had subject matter jurisdiction over the incidences of the divorce.

[¶ 139] Notwithstanding the district court's personal and subject matter jurisdiction to adjudicate the claims between Antonyio and Madonna Johnson, the record suggests there was neither personal nor subject matter jurisdiction to adjudicate Jessica Clayton's purported contract claim.

## VI

[¶ 140] Jessica Clayton is not a party to the divorce. *See* 24 Am.Jur.2d *Divorce and Separation* § 225, 391 (1998) (a child is not a party to a divorce action) (citation omitted). It is undisputed that Jessica Clayton has no consanguineous relation to Antonyio Johnson. "Given that the paramount goal in any divorce proceeding is the just and equitable resolution of the interests and rights of the divorcing spous-

es, the asserted interests of third parties in marital property are best resolved in legal actions separate and apart from the divorce proceeding." 24 Am.Jur.2d *Divorce and Separation* § 232, 395 (1998) (citing *Boyle v. Boyle*, 194 W.Va. 124, 459 S.E.2d 401 (1995)).

[¶ 141] Third parties who may have a legally enforceable interest in the proceeding may intervene. *Id.; see also* N.D.R.Civ.P. 24; *but see Fisher v. Fisher*, 546 N.W.2d 354 (N.D.1996); *Fisher v. Fisher*, 1997 ND 176, 568 N.W.2d 728 (adult children not entitled to intervene in parents' divorce action due to inadequacy of interest). A third party may also join the proceedings. *See* N.D.R.Civ.P. 19. However, under Rule 19 of the North Dakota Rules of Civil Procedure, for a party to join an action, the joining party must be one who is subject to service of process and the joinder cannot deprive the court of jurisdiction. *See also* N.D.R.Civ.P. 20 (allowing permissive joinder of parties).

[¶ 142] "Necessary" or "indispensable" parties must be joined in the action. N.D.R.Civ.P. 19. If full relief can be provided to the parties by the court, a third party is not necessary or indispensable. *Id.* Because Jessica Clayton is not related to Antonyio Johnson, if she were unable to intervene or join in the divorce proceedings, she could assert her purported equitable contract interests in an action "separate and apart from the divorce proceedings." 24 Am.Jur.2d *Divorce and Separation* § 232, 395 (1998) (citing *Boyle v. Boyle*, 194 W.Va. 124, 459 S.E.2d 401 (1995)).

### A

[¶ 143] Unlike a natural child, an adopted child, or even a stepchild, because Jessica Clayton was not a party to the divorce action, and because she did not intervene or join the litigation, her purported contract claim is separate and distinct from the divorce proceeding. The district court must have both personal jur-

isdiction and subject matter jurisdiction to enforce Jessica Clayton's contract claim.

[¶ 144] It is clear that Jessica Clayton could consent to the assertion of the district court's personal jurisdiction. There is, however, no indication in the record that she has consented to jurisdiction. Jessica Clayton was never a party to this divorce action, she was never served with process, and she was never subject to the district court's jurisdictional determination. Jessica Clayton has never lived in North Dakota. The underlying contract claim arose in either New Jersey or Kentucky, and the record is devoid of other facts that would suggest Jessica Clayton is subject to an assertion of personal jurisdiction by the district court under any long-arm provision. Because Jessica Clayton did not join in the litigation, the district court was without jurisdiction to adjudicate her claim.

[¶ 145] Our statutes provide for appointing a guardian ad litem or representative for a minor seeking to enforce a contract claim in court. N.D.C.C. § 14–10–04. Here, no such appointment was made. By failing to appoint a representative to protect her interests, any adjudication of Jessica Clayton's claims would also be statutorily impermissible.

### B

[¶ 146] The district court lacked jurisdiction over the subject matter of Jessica Clayton's contract claim. As noted, the contract arose in either New Jersey or Kentucky. The purported contract was performed in those states and others, but no part of the contract performance ever occurred in North Dakota. Arguably, Antonyio Johnson may have provided support for Jessica Clayton in the intervening month between his arrival in North Dakota and his filing for divorce. Further, payment of support under the district court's interim order may arguably vest the district court with subject matter jurisdiction to hear Jessica Clayton's contract claim.

[¶ 147] However, it is axiomatic that the underlying contract dispute did not arise in North Dakota. Further, the vast majority of performance rendered under the alleged contract was rendered outside the territorial boundaries of North Dakota. Finally, even assuming the district court was able to obtain personal and subject matter jurisdiction over Jessica Clayton's contract claim, the law of Kentucky or the law of New Jersey would apply to the facts of this case.

[¶ 148] The appropriate course for this Court, rather than remanding for a factual determination, would be to determine, sua sponte, that the district court lacks subject matter jurisdiction over Jessica Clayton's purported contract claim. *See Cordie v. Tank,* 538 N.W.2d 214, 217 (N.D.1995) (establishing this Court can raise issues of subject matter jurisdiction sua sponte). Regardless, it is imprudent to proceed to a factual determination regarding the theory of equitable adoption due to the absence of subject matter jurisdiction over the purported contract to adopt.

### VII

[¶ 149] The district court likely concluded there was no contract to adopt in this case. "Adoption is a relationship artificially created by statute. The proceedings are wholly statutory and do not depend upon equitable principles." *Borner v. Larson,* 293 N.W. 836, 839 (N.D.1940) (citation omitted). Although there admittedly was wholly insufficient compliance with any adoption statute, the majority concludes an adoption contract may occur and, if so, equitable contract principles require enforcement of the resultant obligations. Notwithstanding this misconceived notion of equity, Madonna Johnson's misconstrued contract fails in other respects as well.

### A

[¶ 150] The majority suggests a contract may have existed for Jessica Clayton's

adoption. Contracts will not be enforced in equity when there exists a legal remedy. The applicable maxim of the law is clearly evident here: equity will not provide relief when there is an adequate remedy at law. *Matter of Estate of Hill*, 492 N.W.2d 288, 295–96 (N.D.1992). As aptly noted by the district court, Madonna Johnson has numerous legal remedies to obtain support for Jessica Clayton from Jessica's natural parents. The district court stated that Madonna, who now resides in Kentucky, can petition the Kentucky courts for adoption "with notice to her son and Michelle Clayton.... With those possibilities available to Madonna Johnson in her concern for Jessica, the child will not be left without support in the world.... Madonna has the right to seek and receive child support from either or both of the natural parents of Jessica and to receive assistance from her local officials in securing appropriate amounts of child support from Jessica's natural parents."

[¶ 151] The majority's fractured opinion may be a valiant attempt to herald an appropriate, just, and equitable result. However, the majority's end cannot be used to justify its means. Madonna Johnson should be required to seek a remedy at law—a remedy against those statutorily obligated to support Jessica Clayton.

### B

[¶ 152] At ¶ 37, the majority states a contract to adopt must be supported by consideration. The consideration contemplated by the majority at ¶ 37 is preservation of marital harmony. Contrary to this suggestion, preservation of marital harmony is not consideration. "A contract between a husband and wife whereby one spouse agrees to perform specified obligations as part of the spouse's marital duties to each other ... is without consideration and void as against public policy." (41 Am.Jur.2d. *Husband and Wife*, § 137 (1994)). Further, N.D.C.C. § 14–07–07 provides:

A husband and wife cannot by any contract with each other alter their marital relations, except that they may agree in writing to an immediate separation and may make provision for the support of either of them and of their children during such separation. The mutual consent of the parties is a sufficient consideration for such a separation agreement.

### C

[¶ 153] The evidence before the district court showed two previous adoption attempts were abandoned. The parties presented circumstantial evidence regarding contractual intent. Madonna Johnson and Antonyio Johnson presented contradictory testimony regarding the presence or absence of an actual intent to adopt.

[¶ 154] Equitable adoption is a factual question, and if circumstantial evidence is presented, "that evidence must be consistent only with the existence of the equitable adoption and inconsistent with any other reasonable hypothesis leaving nothing to conjecture." 2 Am.Jur.2d, *Adoption* § 53 at 938 (1994) (citation omitted). The majority, at ¶ 36, correctly states: "objective manifestations of contractual assent" are to be used in determining whether a contract exists. *Id.* (citing *Moen v. Meidinger*, 1998 ND 161, ¶ 6, 583 N.W.2d 634).

[¶ 155] The majority, at ¶ 36, also correctly states, "evidence establishing the contract to adopt must be clear, cogent and convincing." The district court, hearing all the evidence, observing the witnesses, and assessing the credibility of those witnesses, is in a far superior position to ascertain these facts. *Estate of Wenzel–Mosset*, 1998 ND 16, ¶ 17, 575 N.W.2d 425 (citing *Matter of Estate of Nelson*, 553 N.W.2d 771, 774 (N.D.1996)).

[¶ 156] However, the district court may have already evaluated the evidence and found it was not probative to the issue of equitable adoption. As noted, "When the alleged adopter is the child's stepparent the courts almost invariably find the proof insufficient on the grounds that the con-

duct of the parties was as consistent with the normal stepparent-stepchild relationship as it was with the contract to adopt." *Otero*, 965 P.2d at 362 (citing *Jan Ellen Rein, Relatives by Blood Adoption, and Association: Who Should Get What and Why*, 37 Vand. L.Rev. 711, 781–82 (1984)).

[¶ 157] The facts presented to the district court were sufficient to affirm the district court's opinion. Antonyio Johnson twice did not complete contemplated adoptions of Jessica, there was no consideration, the promises were illusory, there was no effort by Antonyio Johnson to interfere with Jessica Clayton's ability to obtain support from her natural parents, and Antonyio Johnson's love, affection, and acts of kindness are expected in a step-grandparent-step-grandchild relationship. Any evidence presented on remand must be consistent only with equitable adoption and inconsistent with any other hypothesis. Nothing must be left to conjecture.

## D

[¶ 158] On remand, if the district court does determine there was a contract to adopt, in order to impose a child support obligation the court must also determine that Antonyio Johnson is estopped from denying support. It is well settled that estoppel may be claimed only by one who has detrimentally relied, and only against those causing the reliance. There is no evidence that Madonna Johnson would not have cared for her grandchild absent a promise from Antonyio Johnson to adopt.

## E

[¶ 159] Suggesting a contract to adopt may have existed is improper because such a finding seeks to impose an equitable remedy when there exists a legal remedy. However, on remand, in order to impose a support obligation, the district court must explicitly find there was consideration. The district court must also find there was detrimental reliance and estoppel. Further, the objective manifestations of contractual intent must prove,

by clear, cogent, and convincing evidence that a contract was in fact formed. This heavy burden must remain intact on remand.

## VIII

[¶ 160] As noted by the vast majority of authorities, equitable adoption is a remedy used only for intestate succession. The majority states, at ¶ 9, "The doctrine is an equitable remedy to enforce a contract right and, therefore, it is not intended to create the legal relationship of parent and child, with all its attendant consequences, and does not effect a legal adoption" (citing 2 Am.Jur.2d, *Adoption* § 53 at 930 (1994)). The very next sentence of the source, omitted by the majority, states, "The need for the doctrine arises when the adoptive parent dies intestate; the doctrine is invoked in order to allow the supposed-to-have-been adopted child to take an intestate share. It is not applicable where the decedent dies testate." 2 Am. Jur.2d, *Adoption* § 53 at 930 (1994) (citations omitted).

[¶ 161] The majority, at ¶ 9, suggests the term equitable adoption "bears almost no relationship to a statutory legal adoption." Rather, the theory is used as "an equitable remedy to enforce a contract right and, therefore, it is not intended to create the legal relationship of parent and child, with all its attendant consequences." *Id.* However, as noted above, in every instance in which equitable adoption was applied by this or other courts, the deceased or equitable parent must always, as a condition precedent, have had a parent-child type relationship with the person seeking to enforce a purported contract right. This prerequisite, as implied in the equitable adoption title, is absent here. Further, as a derivative form of adoption, this Court should defer to the legislature to implement social policy change rather than circumvent the protections and statutory requisites imposed by the legislature for a statutory adoption.

## IX

[¶ 162] The majority, at ¶ 39, offers a recitation of the facts of this case that may be used to support application of the theory of equitable adoption. Upon the majority's remand, the district court must also consider the negating factors omitted by the majority. "[A]cts of human kindness referable simply to an undertaking to rear and educate a helpless child do not necessarily bolster a claim that an equitable adoption occurred, and that the acts of and conduct proved should be of such character that they are unmistakably referable to an adoption contract." Locke, Annotation, *Modern Status of Law as to Equitable Adoption or Adoption by Estoppel,* 97 A.L.R.3d 347, 358 (citation omitted). Other circumstances omitted by the majority checklist include: "Existence of adoption contract between natural and foster parents; [n]atural parent's surrender of custody of child;" and numerous other factors. 2 Am.Jur.2d, *Adoption* § 55 at 933 (1994).

[¶ 163] An equitable adoption agreement must be decided on all the facts and circumstances of the case. *Id.* at § 54. "To apply the doctrine of equitable adoption, the contract to be enforced must be definite and certain, be free of fraud, duress, and misrepresentation, be equitable, have mutuality of obligations and remedies, and be founded upon consideration." *Id.* "The agreement must consist of a present promise to adopt, as opposed to a mere desire or intention to adopt in the future." *Id.*

Finally, the facts suggested by the majority must be reviewed by the district court with due consideration that any such conduct would be as "consistent with the normal stepparent-stepchild relationship as it was with the contract to adopt" and nothing can be left to conjecture. *Otero,* 125 N.M. 770, 965 P.2d 354, 362 (Ct.App.1998) (citing *Jan Ellen Rein, Relatives by Blood Adoption, and Association: Who Should Get What and Why,* 37 Vand. L.Rev. 711, 781–82 (1984)).

## X

[¶ 164] Because the majority remands for a factual determination suggesting that there was an equitable adoption- and that Antonyio Johnson is the equitably adoptive father of Jessica Clayton, it apparently follows that Antonyio Johnson may now petition for custody and child support himself.

## XI

[¶ 165] I would affirm the trial court's reasoned decision on the issue of equitable adoption.

[¶ 166] Dale V. Sandstrom