2002 ND 151

Antonyio JOHNSON, Plaintiff
and Appellee,

v.

Madonna L. JOHNSON, Defendant
and Appellant,

and

Jessica Clayton, also known as Jessica Johnson, through her Guardian ad Litem, Lynn Kerbeshian; David Clayton, as the natural father of Jessica Clayton a/k/a Johnson; and Michelle Clayton as the natural mother of Jessica Clayton a/k/a Johnson, Third Party Defendants.

No. 20010288.

Supreme Court of North Dakota.

Sept. 20, 2002.

Steven James Simonson, Grand Forks, for plaintiff and appellee.

Henry H. Howe, Grand Forks, for defendant and appellant.

VANDE WALLE, Chief Justice.

[¶ 1] Madonna L. Johnson appealed from a second amended divorce judgment holding she and Antonyio Johnson had equitably adopted her grandchild, ordering Antonyio to pay child support, distributing the couple's marital property, and refusing to award Madonna spousal support. We conclude the trial court's findings on property distribution and spousal support are not clearly erroneous, but we reverse the child support award and remand for recomputation of the amount of back child support owed by Antonyio.

## I

[¶ 2] We detailed the facts of this case in *Johnson v. Johnson,* 2000 ND 170, ¶¶ 2–7, 617 N.W.2d 97, and will only briefly restate those facts necessary to an understanding of this appeal. Antonyio and Madonna married in 1986 while both were serving in the United States Air Force. In 1988, Madonna's granddaughter, Jessica, began living with the couple and throughout the next ten years, they raised her as their own, although no formal adoption was ever completed. Madonna retired from the military in 1992 after completing 20 years of service and began receiving her pension. Antonyio has remained in the military past the 20–year mark at which he could have retired. In 1998, Antonyio, while stationed at the Grand Forks Air Force Base, sued Madonna, who was living with Jessica and working in Kentucky, for divorce.

[¶ 3] During trial, Madonna asserted she and Antonyio had equitably adopted Jessica and sought child support, spousal support and division of the parties' military pensions. The trial court concluded North Dakota law does not recognize equitable adoptions and refused to impose a child support obligation upon Antonyio. The court divided the parties' marital property, but refused to divide their military pensions. The court also denied Madonna's request for spousal support.

[¶ 4] In *Johnson,* 2000 ND 170, ¶ 9, 617 N.W.2d 97, after noting the doctrine of equitable adoption "is an equitable remedy to enforce a contract right and, therefore, it is not intended to create the legal relationship of parent and child, with all its attendant consequences, and does not effect a legal adoption" and "despite its name, bears almost no relationship to a statutory legal adoption" a majority of this Court concluded "the doctrine of equitable adoption may be applied to impose a child support obligation upon an equitable parent when the circumstances of the case so require," and reversed and remanded for findings on whether an equitable adoption had occurred. *Id.* at ¶ 34. The majority was unable to determine whether the trial court's refusal to divide the military pensions resulted in an inequitable property division, and remanded for clarification of the court's reasoning. *Id.* at ¶ 47. The majority upheld the trial court's refusal to award spousal support to Madonna, but allowed the court to revisit its denial of spousal support in conjunction with its clarification of the property division. *Id.* at ¶ 51.

[¶ 5] On remand, the trial court ordered that a guardian ad litem be appointed for Jessica, and that the child and her biological parents be served and added to the litigation as third party defendants. The guardian ad litem consented on behalf of Jessica to an equitable adoption. Both biological parents also consented to an equitable adoption of Jessica.

[¶ 6] After limiting any additional evidence on remand to affidavits, the trial court found that "Jessica has been equitably adopted by Anton[y]io and Madonna" and awarded Madonna custody of the child. The court computed Antonyio's child support obligation under the child support guidelines at $669 per month effective October 1, 2001, the month following entry of the second amended judgment. The court also ordered Antonyio to pay $500 per month child support effective August 1, 2001 to October 1, 2001. The $500 amount represents the interim child support amount which was ordered to be paid, but was terminated when the trial court initially ruled the doctrine of equitable adoption did not apply. The court again refused to divide the parties' military pensions as part of the property distribution, and refused to order either party to

pay spousal support. Madonna appealed. Antonyio did not file a cross-appeal and does not challenge the trial court's finding that an equitable adoption occurred.

## II

■ [¶ 7] Madonna does not argue Antonyio's child support obligation of $669 per month was incorrectly computed under the child support guidelines, but argues the court should have awarded back child support of $669 per month commencing January 1, 1999 through the entry of the second amended judgment in September 2001.

■ [¶ 8] Child support determinations involve questions of law which are subject to the de novo standard of review, findings of fact which are subject to the clearly erroneous standard of review, and may, in some limited areas, be matters of discretion subject to the abuse of discretion standard of review. *Logan v. Bush*, 2000 ND 203, ¶ 8, 621 N.W.2d 314. Because parents have a mutual duty to support their children, failure to award interim child support to a custodial parent is error as a matter of law. *Ackerman v. Ackerman*, 1999 ND 135, ¶ 21, 596 N.W.2d 332.

[¶ 9] The record on this issue is somewhat confusing. In Madonna's initial September 1998 motion for an interim order she requested $500 per month as "interim child support" and asked that Antonyio maintain the $454 monthly payments on her 1994 Honda Accord as "temporary spousal support." The trial court, however, ordered Antonyio to pay "interim spousal support in the amount of $500 per month, the amount that had been agreed upon and had actually been paid by Antonyio Johnson to Madonna Johnson during the period May 1997 through August 1998, with such support to commence 01 October 1998 and to be payable on the first of each

and every month thereafter until further order of the court." Antonyio was also ordered to maintain the monthly car payments as "an additional aspect of temporary spousal support." At a January 1999 hearing on Antonyio's motion to amend the interim order, Madonna argued for continuation of the $500 per month "child support," which the trial court noted, "we've been calling … spousal support." Antonyio argued the monthly car payments he was making "alone satisfie[d][the] child support [guidelines]." The trial court ruled, "whether or not there should be something characterized as child support," Antonyio would be allowed to offset the $454 per month payment on the 1994 Honda Accord against the $500 per month "interim spousal support effective January 1999." The parties nevertheless continued to refer to the $500 monthly payment as "child support," and in her post-trial brief, Madonna specifically requested "child support" of $500 per month, "commencing 01 Sep 1998, with plaintiff to be given credit for amounts paid for child support from and after that date." In its September 1999 memorandum decision rejecting the concept of equitable adoption, the trial court said "all interim orders for interim child support from Antonyio to Jessica shall be canceled as of the first day of the first month following the entry of judgment in this case," and the judgment was entered in September 1999. The "Child Support Master File Print" contained in the record states Antonyio's last payment was made on March 4, 1999.

[¶ 10] In its July 2001 memorandum decision on remand, the trial court noted that "[d]uring the pendency of this action [Madonna] has been receiving $500.00 per month from Antonyio as child support for Jessica." In ruling no retroactive effect would be given to the new computation of

$669 per month under the child support guidelines, the court reasoned:

> In the meantime interim child support payable by Antonyio to Madonna for Jessica shall continue at the monthly amount of $500 as previously ordered herein until judgment i[s] entered on this Memorandum Decision and Order for Judgment to be drawn therefrom. That Judgment shall decree, as of its date of entry, the existence of the equitable adoption of Jessica Clayton Johnson by Madonna and Antonyio. That effective date has been determined because the decision of the North Dakota Supreme Court authorizing equitable adoptions in divorce cases directed this Court review the facts in evidence and to enter judgment in accordance with the law as stated in the Supreme Court's opinion. Therefore, in this Court's opinion, no retroactive effect should be given to the determinations of monthly child support amount that will be ordered under this Memorandum Decision.

[¶ 11] The second amended judgment entered in September 2001 ordered Antonyio to pay $500 per month child support for August and September 2001, and to begin paying $669 per month child support effective October 1, 2001.

[¶ 12] We conclude the $500 per month awarded to Madonna in the original interim order, while technically labeled "spousal support," was intended to be child support. The parties and the court appear to have treated this amount as child support regardless of its label. From January 1999 through March 1999, the trial court allowed Antonyio to deduct the $454 car payment he was making on Madonna's vehicle from the $500 amount. We have said "an award of spousal support calculated primarily to offset and negate a child support obligation is inappropriate." *Corbett v. Corbett*, 2001 ND 113, ¶ 22, 628 N.W.2d 312. Nevertheless, we conclude there was no error under the unique circumstances of this case. Antonyio had been sending Madonna $500 per month and making the car payment since March 1997, which became labeled additional spousal support in the interim order. The trial court ultimately concluded Madonna was not entitled to spousal support, and we affirmed that ruling in *Johnson*, 2000 ND 170, ¶ 51, 617 N.W.2d 97. The offset allowed Antonyio for spousal support by the trial court still resulted in Madonna receiving the $500 amount ordered for interim child support.

[¶ 13] Moreover, we conclude the trial court did not err in refusing to make the $669 per month child support obligation effective January 1, 1999. Antonyio's counsel argued to the court in January 1999 that the $500 being paid at that time exceeded the then applicable child support guideline amount. The trial court did not determine until July 2001 that Jessica had been equitably adopted by Antonyio and Madonna. Under these circumstances, we see no error in the trial court refusing to award back child support in the amount of $669 per month.

[¶ 14] However, the trial court appears to have been under the mistaken impression that Antonyio had been making continuous $500 monthly payments throughout the pendency of these proceedings. According to the "Child Support Master File Print," Antonyio made his last payment on March 4, 1999. Madonna is therefore entitled to back child support of $500 per month from April 1999 through July 2001.

[¶ 15] We also conclude the trial court erred in ordering payment of $500 per month child support during August and September 2001, the two months it took for a formal judgment to be entered.

*See Olson v. Garbe,* 483 N.W.2d 775, 776 (N.D.1992) (reasoning if an order increasing a child support obligation were required to be prospective only from the date of its entry, then the obligor could by dilatory tactics postpone the obligation to pay increased support almost indefinitely). The trial court determined in July 2001 that an equitable adoption had occurred and that Antonyio, therefore, had a "clear duty to support." *Edwards v. Edwards,* 1997 ND 94, ¶ 17, 563 N.W.2d 394. *Cf. Geinert v. Geinert,* 649 N.W.2d 237, 2002 ND 135, ¶ 10 (holding a modification of child support should generally be made effective from the date of the motion to modify, absent good reasons to set some other date). The trial court erred in failing to order Antonyio to pay child support of $669 per month effective August 1, 2001.

[¶ 16] Accordingly, we reverse the child support determination and remand to the trial court for the limited purpose of computing the back child support owed by Antonyio for the period from April 1999 through July 2001 at the rate of $500 per month, and to change the effective date of the $669 per month child support obligation to August 1, 2001.

## III

[¶ 17] Madonna argues the trial court erred in distributing the parties' marital property because the court awarded each their own military pension instead of dividing the pensions under the formula adopted in *Bullock v. Bullock,* 354 N.W.2d 904 (N.D.1984).

[¶ 18] Under N.D.C.C. § 14–05–24(1), a trial court must "make an equitable distribution of the property and debts of the parties." A trial court's determinations regarding division of marital property are treated as findings of fact that will not be reversed on appeal unless clearly erroneous. *Mellum v. Mellum,*

2000 ND 47, ¶ 14, 607 N.W.2d 580. There is no set formula for this division, but rather it should be based on the facts of the case. *Johnson,* 2000 ND 170, ¶ 43, 617 N.W.2d 97. The distribution need not be equal to be equitable, but the trial court must explain a substantial disparity. *Gregg v. Gregg,* 1998 ND 204, ¶ 13, 586 N.W.2d 312. Use of the *Bullock* formula to distribute retirement pay is not mandatory because the formula is not the only method of achieving an equitable division of marital property. *See Northrop v. Northrop,* 2001 ND 31, ¶ 11, 622 N.W.2d 219; *Johnson,* 2000 ND 170, ¶ 45, 617 N.W.2d 97; *Braun v. Braun,* 532 N.W.2d 367, 370 (N.D.1995); *Anderson v. Anderson,* 504 N.W.2d 569, 571 n. 2 (N.D.1993); *Morales v. Morales,* 402 N.W.2d 322, 323 (N.D. 1987).

[¶ 19] The trial court noted that Madonna was 49 years old and Antonyio was 41 years old at the time of its decision on remand. Madonna retired from the Air Force in February 1992, her earliest opportunity to do so and receive a pension after having served 20 years in the military. Antonyio enlisted in the Air Force in June 1977 and was still on active duty during these proceedings. His mandatory retirement date after 30 years of service would be June 2007. The court noted both parties held the enlisted pay grade of E–5 when they married in 1986 and both attended in-service educational courses during the marriage, with Antonyio taking classes in management and Madonna taking classes in administrative training. After her retirement from the military, Madonna obtained a position as a full-time administrative assistant at Jefferson Vocational School in Kentucky and was earning $7.50 per hour. Antonyio held a paygrade of E–8 at the time of trial. Madonna had three semesters left to complete the bachelor's degree she wanted in school adminis-

tration, and her employer was willing to pay the tuition.

[¶ 20] Madonna argued her military retirement entitlement at the time of trial was $763 per month, and under the *Bullock* formula, because one-half of her retirement benefits is attributable to a disability, Antonyio's share of her retirement would amount to $51.26 per month. Madonna also argued if Antonyio retired from the military in June 2002 with a total of 25 years of service, her share of Antonyio's retirement under the *Bullock* formula would be $513.66 per month. There was no evidence presented of the present value of the parties' pensions.

[¶ 21] In refusing to apply the *Bullock* formula, the court focused on the tangible property already received by each party. Antonyio valued property received by Madonna at $22,500 and property received by himself at $3,533. Madonna valued property received by herself at $14,350 and property received by Antonyio at $3,700. The court also noted Antonyio made all the payments on Madonna's car; including $3,632 paid after the trial. The court reasoned:

> Even at Madonna's conservative valuations as to her own distributions she acknowledges having received $3.87 + in value of goods for ever[y] dollar of value received by Antonyio.... In Antonyio's analysis of the substantially similar distribution of tangible property items between himself and Madonna he asserts that the tangible property division to Madonna is more than *six times* as valuable as such property of the marriage that he received. By any standard of reason Madonna has been heavily and disproportionately favored in this property division.

> Additionally, the *Bullock* formula was developed as means of dividing the property when only one of the marriage partners was a military person that would become entitled to military retirement pay. In *Bullock* the wife was a stay at home mom. She shelved her career opportunities to aid in the furtherance of her husband's military career. She also was in need of property distribution to aid in her training for individual employment. Here, Madonna had been an enlisted member of the Air Force for fourteen years *before* she married Antonyio, a fellow E-5 paygrade, Staff Sergeant while both of them were stationed at an airbase in England. There is no similarity between *Bullock* and this case which appeals for equitable relief in respect to retirement pay. Following her retirement in 1992, Madonna has been gainfully employed[.][S]he has completed approximately two-thirds of her studies for a bachelors' degree in school administration. Madonna has admitted that the cost of tuition for the remainder of her training would be paid by her employer. Such employer support augurs well for her future employment in that system.

[¶ 22] Although we have concluded the $500 monthly payments prior to trial were child support rather than spousal support, in light of the trial court's reasoning set forth above, we nevertheless conclude the trial court did not err in refusing to divide the parties' military pensions under the *Bullock* formula, and we further conclude the trial court's property distribution is not clearly erroneous.

IV

[¶ 23] Madonna argues the trial court erred in failing to award to her, or to reserve for future consideration, temporary or permanent spousal support.

[¶ 24] To award spousal support, the trial court must find the requesting spouse is disadvantaged. *Hoverson v.*

*Hoverson*, 2001 ND 124, ¶ 31, 629 N.W.2d 573. In considering a spousal support award, the trial court must take into account the needs of the disadvantaged spouse and the supporting spouse's needs and ability to pay. *Sommer v. Sommer*, 2001 ND 191, ¶ 10, 636 N.W.2d 423. Spousal support determinations are treated as findings of fact which will not be set aside on appeal unless clearly erroneous. *Weigel v. Weigel*, 2000 ND 16, ¶ 6, 604 N.W.2d 462.

[¶ 25] In *Johnson*, 2000 ND 170, ¶ 51, 617 N.W.2d 97, we affirmed the trial court's refusal to award Madonna spousal support, but allowed the trial court to revisit the spousal support issue in conjunction with its distribution of the marital property. The trial court essentially found Madonna was not a disadvantaged spouse and again determined an award of permanent or rehabilitative spousal support was "unnecessary" in this case:

> Madonna's employer has made provision for her tuition payments if she wishes to complete her college education. In this spousal support connection the wide disparity of tangible property division in Madonna's favor is material and that distribution has relieved her of many of the expenses of reentering civilian life and has left Antonyio with only a small fraction of the marital estate.
>
> . . . .
>
> On the other hand, when Antonyio retires from the Air Force any further or higher education will likely be at his own expense. It appears to the Court that each of the principal parties to this divorce have enjoyed military career opportunities and success during their years of service that is consistent with their own good efforts and opportunities; and that such opportunities do not appear to have been impinged in any significant way by their mutual cooperation during their marriage from 1986 until their separation and divorce.

[¶ 26] We conclude the trial court's refusal to award, or to reserve for Madonna, spousal support is not clearly erroneous.

## V

[¶ 27] We affirm the trial court's decisions on property distribution and spousal support. We reverse the child support determination and remand for the limited purpose of computing the back child support owed by Antonyio and to change the effective date of his $669 per month child support obligation in accordance with this opinion. We deny Madonna's request to reassign this case to a different district judge on remand.

[¶ 28] CAROL RONNING KAPSNER, MARY MUEHLEN MARING, and WILLIAM A. NEUMANN, JJ., concur.

SANDSTROM, Justice, concurring and dissenting.

[¶ 29] Recall that:

> This is a case of a grandmother and her grandchild who have never lived in North Dakota. When the child's parents could not or would not care for her, her grandmother took her in. The grandmother's husband, although not the child's grandfather, welcomed the child and treated her well. The grandmother, but not her husband, was given temporary legal custody of the child. There was talk of adoption and some steps were taken, but the grandmother's husband did not adopt the child, nor did the grandmother adopt the child. The parental rights of the child's natural mother and natural father were never terminated. When the marriage of the grandmother and her husband was coming to an end, the grandmother, instead of seeking support from the child's par-

ents, sought a declaration that her husband had "equitably adopted" the child and was therefore obligated to pay child support.

*Johnson v. Johnson,* 2000 ND 170, ¶ 54, 617 N.W.2d 97 (Sandstrom, J., dissenting). After being rebuffed by the trial court, the grandmother had much of her wish granted by the majority, and the case remanded.

[¶ 30] In my lengthy dissent in *Johnson,* I pointed out the extensive errors of the majority. A few of the identified problems were dealt with in the trial court on remand, but the fundamental misuse of judicial power remains: there is no retreat by the majority from its invasion of legislative territory; the misapplication of an intestate probate doctrine to "adoption" and child support continues; and, the principles of comity are still ignored, as are the "inconvenient" facts that if "equitable adoption" occurred, it occurred in Kentucky or New Jersey, governed by the laws of Kentucky or New Jersey, but neither Kentucky nor New Jersey recognize such "equitable adoption." *Id.*

[¶ 31] The majority seeks to rehabilitate its opinion in *Johnson* by implying that Antonyio Johnson agrees that equitable adoption occurred, and by a quotation out of context.

[¶ 32] Antonyio Johnson does not concede that equitable adoption occurred. Rather, as his attorney stated at oral argument, an appeal on the issue would be pointless to this Court as presently constituted.

[¶ 33] The majority continues its "now-you-see-it, now-you-don't shell game," saying both that "equitable adoption" is and is not adoption. *Johnson,* 2000 ND 170, ¶ 56, 617 N.W.2d 97 (Sandstrom, J., dissenting). "But the problem for the majority is that if 'equitable adoption' is adoption, it has not occurred. If it is not adoption, then the majority cannot impose a child support obligation on the grandmother's former husband." *Id.*

[¶ 34] The majority, at ¶ 4, repeats the out-of-context quotation in *Johnson:* "the doctrine of equitable adoption 'is an equitable remedy to enforce a contract right and, therefore, it is not intended to create the legal relationship of parent and child, with all its attendant consequences, and does not effect a legal adoption.' " As I pointed out in my previous dissent, the majority omits the next sentence and the important context:

As noted by the vast majority of authorities, equitable adoption is a remedy used only for intestate succession. The majority states, at ¶ 9, "The doctrine is an equitable remedy to enforce a contract right and, therefore, it is not intended to create the legal relationship of parent and child, with all its attendant consequences, and does not effect a legal adoption" (citing 2 Am.Jur.2d, *Adoption* § 53 at 930 (1994)). The very next sentence of the source, omitted by the majority, states, "The need for the doctrine arises when the adoptive parent dies intestate; the doctrine is invoked in order to allow the supposed-to-have-been adopted child to take an intestate share. It is not applicable where the decedent dies testate." 2 Am.Jur.2d, *Adoption* § 53 at 930 (1994) (citations omitted). The majority, at ¶ 9, suggests the term equitable adoption "bears almost no relationship to a statutory legal adoption." Rather, the theory is used as "an equitable remedy to enforce a contract right and, therefore, it is not intended to create the legal relationship of parent and child, with all its attendant consequences." *Id.* However, as noted above, in every instance in which equitable adoption was applied by this or other courts, the deceased or equitable parent

must always, as a condition precedent, have had a parent-child type relationship with the person seeking to enforce a purported contract right.

*Johnson,* 2000 ND 170, ¶¶ 160–61, 617 N.W.2d 97 (Sandstrom, J., dissenting).

[¶ 35]   Only because Antonyio Johnson does not appeal, I would affirm the judgment of the trial court.

[¶ 36]   Dale Sandstrom